HARRY B. FRIEDMAN V. AMERICAN SURETY
COMPANY OF NEW YORK ET AL.

No. 7723. Decided April 9, 1941.
Rehearing overruled May 28, 1941.
Second Motion for rehearing overruled July 9, 1941.
(151 S. W., 2d Series, 570.)

*Phillip Tocker*, of Fort Worth, for appellant.

An unemployment tax contribution based on wages by an independent subcontractor to his own employees, which the statutes requires the principal contractor to pay and which he does pay, but which statute gives said principal contractor the right to recover the sums so paid from the subcontractor is a claim under the express provisions of the contract. And a bond, which is expressly referred to as a part of the said contract, and which guarantees that its principal shall perform all of the terms, etc., of said contract, obligates the surety on that bond to reimburse the general contractor in the event the subcontractor and principal in the bond is insolvent. Meyers v. Wood, 95 Texas 67, 65 S. W. 174; Galveston, T. & S. A. Ry. Co. v. Walker, 219 S. W. 815; 39 Tex. Jur. 917.

*Lloyd E. Price* and *Hamilton Rogers*, both of Fort Worth, for appellee.

On the question of the validity of the Texas Unemployment Compensation Law. Lally v. State, 138 S. W. (2d) 1111; Travelers Ins. Co. v. Marshall, 124 Texas 45, 76 S. W. (2d) 1007; Mellinger v. City of Houston, 68 Texas 37, 3 S. W. 249.

*Gerald C. Mann*, Attorney General, *George W. Barcus, Glenn R. Lewis, Morris Hodges*, Assistants Attorney General, *Scarborough, Yates & Scarborough,* of Abilene, and *J. W. Gormley,* of Dallas, filed briefs as amicus curiae.

MR. JUSTICE CRITZ delivered the opinion of the Court.

This is a certified question from the Court of Civil Appeals for the Second District at Fort Worth. The certificate is accompanied by a tentative opinion, as required by our rules. The certificate is as follows:

"TO THE SUPREME COURT OF TEXAS:

"This is an appeal by Harry B. Friedman from an adverse judgment entered against him in a cause in which he sued American Surety Company of New York, as surety on a bond executed by F. M. Kuhlman, as principal, and that company, as surety. Allegations were made that Kuhlman was insolvent and the company alone was sued.

"Friedman's petition shows that he was the original contractor for the construction of a building for Fort Worth Independent School District; that he sublet to Kuhlman the lath and plaster work; that he held a contract with Kuhlman for the work covered by the subcontract, by which Kuhlman was to perform the work set out therein and would pay all claims arising thereunder for which he, Friedman, could be held liable, and that the American Surety Company of New York guaranteed Kuhlman's faithful performance of the contract; that after he (Friedman) had paid Kuhlman the contract price provided for in the contract, the Unemployment Compensation Commission of Texas demanded of him, Friedman, the payment of a tax owing to the Texas Unemployment Compensation Fund, amounting to $293.98, on the labor performed by Kuhlman's employees, since Kuhlman was not an employer under the law. The payment was made by Friedman and he asserted his right to collect it back from Kuhlman under the law as it was alleged to have existed at all times prior to the institution of the suit on October 31st, 1938.

"Among other defenses interposed by the defendant surety company was one asserting that the law and statute of Texas purporting to levy and collect a social security tax, such as plaintiff claims to have paid and for which he sued defendant, is void and in violation of the Constitutions of the State and the United States; that it violates the due process clause of the United States Constitution; that it violates the State Constitution which provides for the class and kind of taxes that can be levied and collected; that its enforcement would impair contracts previously made and that said law violates the necessairly implied provision of the Constitution which forbids the Legislature to delegate its powers to any other body, board or bureau.

"There is no material conflict in the evidence as disclosed by the record, and only a question of law is involved. For the purpose of the inquiry herein made, we believe enough has

been said in regard to the pleadings to enable the Honorable Supreme Court to understand the controversy.

"On May 12th, 1936, Harry B. Friedman entered into a contract and bond with Fort Worth Independent School District for the erection of a Senior High School Building for an agreed price of $340,160.00.

"On May 27, 1936, Friedman sublet to F. M. Kuhlman, doing business in the trade name of Fort Worth Plastering Co., all lath and plaster work to be done in the construction of said building, for an agreed price of $26,000.00, and on the same date, in compliance with the provisions of the contract, Kuhlman executed his bond to Friedman for $26,000.00, upon which bond American Surety Company of New York was surety.

"By the terms of the contract between Friedman and Kuhlman, the latter was familiar with all conditions and provisions of the contract between Friedman and the School District. Kuhlman obligated himself to Friedman in the performance of the subcontract in the same manner that Friedman was obligated to the School District.

"Among other things, the contract with Kuhlman provided:

"'Article III. The contractor (Kuhlman) shall pay promptly when due, for all labor and materials used and required, and protect the owner (School District) and Harry B. Friedman from all claims, mechanic's liens, judgments, court costs and all attorney's fees and expenses incurred on account of any failure on its (his) part to explicitly comply with this contract.'

"'Article VIII. The contractor (Kuhlman) shall protect, indemnify and save Harry B. Friedman and owner (the District) harmless from any and all claims, suits and actions of any kind or description, from damages or injuries to persons or property * * *.'

"'Article XIV. Should there prove to be any lien or claim after all payments are made, the contractor and its (his) surety shall refund to Harry B. Friedman all moneys that the latter shall be compelled to pay in discharging any lien or claim on said work made obligatory in consequence of said contractor's default.'

"The bond made to Friedman by Kuhlman, upon which American Surety Company appears as surety, and made a part of the contract, contains this provision:

"'Now therefore if the said principal (Kuhlman) shall well, truly and faithfully keep and perform all of the terms, provisions, covenants and conditions of the foregoing contract * * * and shall repay said Harry B. Friedman all costs and expenses said Harry B. Friedman may incur in the prosecution of any suit or suits which they may maintain against said principal on account of any breaches of said contract or of this bond, then this obligation shall be void, otherwise the same shall remain in full force and virtue.'

"Friedman began the construction of said building under his contract with the School District in June, 1936, and completed the structure and delivered it to the District in December, 1937.

"Kuhlman began his work of lathing and plastering, under his subcontract with Friedman, January 1st, 1937, and completed it when the building was finished in December, 1937. Friedman then made full payment to Kuhlman for the contract assumed by him.

"We call attention to the Legislative Acts and their several amendments. By House Bill No. 407, Chapter 236, the 44th Legislature passed what is now Article 5221a-2, V. T. C. S., which, among other things, accepts the provisions of the Wagner-Peyser Act (48 Stat. 113 U. S. Code Title 29, Section 49), effective from and after May 11th, 1935.

"Article 5221a-2, Sect. 2, designates the Bureau of Labor Statistics as the agency of the State in administering the Act. Article 5221b-8 creates within the Bureau of Labor Statistics the Texas Unemployment Compensation Commission and the several subsections of that article provide for the organization of the Commission and the qualifications of its member(s). Article 5221b-9 enjoins upon the Commission the duty of administering the Act. Power and authority is given the Commission to promulgate rules and regulations, not inconsistent with law, by which the Act is to be administered.

"Under Article 5221a-2, Sect. 5, all funds allocated to the State by the Federal Government in virtue of the Wagner-Peyser Act, shall be paid into the State Treasury, and by Article 5221b-7, a special fund is created to be kept separate and apart from all other funds, in which all moneys received by the State under the Act shall be administered by the Commission, above referred to.

"By Senate Bill No. 5, Chapter 482, Third Called Session, 44th Legislature, page 1993, at Section 7 (a), effective October 27th, 1936, this provision appears:

"'Section 7 (a). Payment: (1) On and after January 1st, 1936, contributions shall accrue and become payable by each employer for each calendar year in which he is subject to this Act, with respect to wages payable for employment (as defined in section 19 (g) occurring during the calendar year. Such contribution shall become due and be paid by each employer to the Commission for the fund in accordance with such regulation as the Commission may prescribe, and shall not be deducted in whole or in part, from the wages of individuals in his employ."

"The foregoing provision was amended in some respects, immaterial to the point involved here, effective April 1st, 1939, and now appears as Article 5221b-5 (a), V. T. C. S.

"Among the rules and regulations promulgated by the Commission in No. Five, which reads:

"'Time for payment of contributions for Employers. Newly Subject: In the case of an employer who becomes newly subject to the law in any year after 1936 by reason of employment performed for him within such year, his first contribution payment shall become due and be paid on or before the 25th day of the month wherein occurred the 20th week during the calendar year, within which he had eight (8) or more employees on any one day. Such first payment of an employer becoming newly subject in the course of a calendar year shall include contributions on wages payable for employment from the beginning of such calendar year.'

"Regulation No. 15 reads:

"'Employers Liable for Contributions: Commencing with the calendar year 1936, any person who employs eight (8) or more individuals on a total of twenty (20) or more calendar days during a calendar year, each such day being in a different calendar week, is an employer subject to this Act. The several weeks in each of which occurs a day upon which eight (8) or more individuals are employed need not be consecutive weeks. It is not necessary that the individuals so employed be the same individuals; they may be different individuals on each such calendar day. Neither is it necessary that the eight (8) or more individuals be employed at the same moment of time or for any particular length of time or on any particular basis of

compensation. It is sufficient if the total number of individuals employed during the twenty-four (24) hours of the calendar day is eight (8) or more regardless of the period of service during that day or the basis of compensation. Any employer becoming subject to this Act during a calendar year is subject for the entire year and the succeeding calendar year.'

"After the construction of the building as contracted by Friedman and after Kuhlman had completed his sub-contract work and the building was received by the School District, in December, 1937, and payment had been made by Friedman to Kuhlman, a representative of the Commission went to Fort Worth, where the parties resided, and advised Friedman that Kuhlman's report did not disclose that he was an employer subject to the tax that he, Friedman, would be required to pay the tax, based upon labor performed by Kuhlman's laborers.

"Demand was promptly made by Friedman on Kuhlman for payment of the tax. Kuhlman said he felt a moral obligation to pay it, but was financially unable to do so. Demand was likewise made by Friedman upon American Surety Company, Kuhlman's surety on the bond; the surety declined to pay.

"When both Kuhlman and his surety refused payment, Friedman paid the required tax of $290.00 to the Commission, and incurred an expense of $3.98 in connection therewith.

"Since the passage of the Act by the 44th Legislature, Third Called Session, page 1993, and until it was amended by the 46th Legislature, after this cause of action arose and suit was instituted, S. B. No. 5, Chapter 482, Section 19 (e) provided that persons situated as was Friedman, who were required to pay the unemployment tax on labor contracted and paid for by their agents or subcontractors, who did not fall within the definition of an employer under section 19 (f) or section 8 (c) of the Act, could recover the amount so paid from the agent or subcontractor. It was upon this provision that Friedman relied in his suit against the American Surety Company, the surety on Kuhlman's bond. Kuhlman was shown to be insolvent at the time the suit was filed and was not made a party defendant.

"The amount involved is comparatively small, but this does not detract from the importance of the legal question involved. The law applicable is new in this State; it involves the constitutional right of the Legislature to enact it, as well also designated arm of the State Government to enforce the collection of

specified amounts, sometimes referred to as contributions and taxes to be placed in the State Treasury for disbursement by a named Commission for specific purposes. We are not in complete harmony on our views of the points involved as expressed in the accompanying tentative opinion, nor are we entirely satisfied that we have reached the proper conclusions therein, and therefore deem it advisable to certify to our Supreme Court a question which, when answered, will enable us to dispose of that and other points involved. The question which we desire to have answered is:

"Do Articles 5221a and 5221b, Vernon's Tex. Civ. St., and the various sections and subsections thereof purporting to create a Texas State Employment Service, providing for the collection of a tax to be placed in the State Treasury for a designated purpose and the creating of an Unemployment Compensation Commission to enforce and administer the Act, violate Article 1, Sections 3, 16, 17 and 19 of the Bill of Rights and Constitution of Texas, or either of said sections?"

The statutes involved in this case are Acts 1936, 44th Leg., 3d Called Session, p. 1993, ch. 482, as amended by Acts 1937, 45th Leg., p. 121, ch. 67, and the Acts of 1939, 46th Leg., 436. These Acts as they now exist are carried as Articles 5221b-1 to 22, both inclusive. The Act is generally referred to as the "Unemployment Compensation Act."

It will be noted that the question certified directly confines itself to Sections 3, 16, 17, and 19 of Article I of our Constitution. Since the constitutionality of this Act is involved, we deem it necessary to determine whether the Act violates certain other provisions of our Constitution. These provisions are Sections 48 and 51 of Article III, and Section 6 of Article VIII. In the course of this opinion we will also refer to Sections 48a, 51a, 51b, 51c, and 51d, of Article III.

1 The Act is very long and complicated. Its principal purpose is to provide insurance or compensation for the employees of a certain class of employers during involuntary unemployment. In order to provide a fund out of which such unemployment compensation can be paid, the Act requires all employers who come within its scope to make contributions to the Commission created by the Act in amounts that are determined or measured by the amount of wages paid by such employers to their employees. The unemployment compensation provided by

the Act is paid directly to the unemployed employees who come within its provisions, in amount and for the time stipulated by the Act, upon their compliance with its applicable provisions. The question of need is not involved. The fund created by the Act, by the express terms thereof, never becomes a State fund; but can only be used for the purposes for which it was created. Heavy penalties are imposed upon employers coming under the Act who fail to pay the tax imposed by it, and unpaid taxes constitute liens in certain instances.

Subdivision a of Section 7 of Article 5221b of this Act establishes an Unemployment Compensation Fund. It provides that such fund is established as a special fund, separate and apart from all public moneys or funds of the State. Such fund is subject to, and under the administration of, the Unemployment Compensation Commission. The Commission consists of three members, and, generally speaking, it is charged with the duty of administering the Unemployment Compensation Fund. Under the provisions of this subdivision of Section 7, all moneys collected by authority of the Unemployment Compensation Act belong to the Unemployment Compensation Fund, and all such moneys are mingled and undivided.

Subdivision b of Section 7 of Article 5221b constitutes the State Treasurer custodian of the Unemployment Compensation Fund. Under the provisions of this subdivision the money collected for such fund is never paid into the State Treasury, nor is it contemplated that such shall ever be done. The officer who fills the office of State Treasurer is simply given an added duty of responsibility. It is made the duty of such officer to act as custodian of the Unemployment Compensation Fund, and to pay it over as provided by the Act. The money collected for such fund,—though levied and collected in the form of excise taxes,—is not levied or collected to become a fund of the State, as such. To the contrary, it is levied and collected under statutory provisions that set it apart for the purpose for which it was collected, and it can be used for no other purpose. Simply stated, the fund created by the Act in its very inception becomes the property of a trust created for the benefit of a class of citizens of this State—the unemployed whose employers have created it. The taxes are levied and collected for such fund, and not for the State in its sovereign capacity. The statute permanently appropriates this fund to be used for the purposes for which it was collected,

without the necessity of an appropriation by the Legislature every two years.

Generally speaking, the Act covers only employers who employ eight or more employees. Only the employees of such employers are entitled to draw unemployment compensation. Certain classes of employment are excluded from the Act. These classes are:

(A) Service performed in the employ of this State or of any political subdivision thereof, or of any instrumentality of this State or its political subdivisions;

(B) Service with respect to which unemployment compensation is payable under an unemployment compensation system established by the Act of Congress; provided, etc.

(C) Agricultural labor;

(D) Service in a private home;

(E) Service performed as an officer or member of the crew of a vessel on the nevigable waters of the United States;

(F) Service performed by an individual in the employ of his son, daughter, or spouse, and service performed by a child under the age of twenty-one years in the employ of his father or mother;

(G) Service performed in the employ of a corporation, community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to any private shareholder or individuals.

Before proceeding further we pause to say that we think the provisions of this Act requiring employers coming within its terms to make the contributions above described constitute this Act a taxing statute, and that such contribuions are in the nature of excise taxes. We think this is so evident as not to require the citation of authorities. In our further discussion of this Act we shall therefore assume that it levies a tax in the nature of an excise tax.

2 It seems to be contended that the above-mentioned exceptions render this Act antagnostic to Section 3 of Article I of our State Constitution. That constitutional provision provides

that all free men have equal rights, and no man, or set of men, is entitled to exclusive separate public emoluments or privileges, but in consideration of public services. It is settled that this constitutional provision guarantees to all men equality of rights. 9 Tex. Jur., p. 551, sec. 115. In spite of this, the State can adjust its legislation to differences in situation. 9 Tex. Jur., p. 553, sec. 117. Our Constitution does not forbid legislative classification of subjects and persons for the purpose of regulatory legislation, but it does require that the classification be not arbitrary or unreasonable. Classifications must be based on a real and substantial difference, having relation to the subject of particular enactment. If there is a reasonable ground for the classification, and the law operates equally on all within the same clash, it will be held valid. 9 Tex. Jur., p. 558, sec. 120. We will not extend this opinion by attempting to analyze or discuss the above exceptions. It is sufficient to say that, measured by the above rules, the classifications and exceptions made by this Act are not unreasonable or arbitrary. Stated in another way, we think that such classifications are based upon real and substantial differences having relation to the subject matter of the legislation.

Section 16 of Article I of our Constitution provides that no bill of attainder, ex post facto law, retroactive law, or any law impairing the obligation of contracts, shall be made. We can see nothing in this Act that even remotely violates this constitutional provision. As shown by the certificate of the Court of Civil Appeals, this is a suit on a contract. The suit bears some relation to this Act. The Court of Civil Appeals has not asked this Court to interpret such contract.

Section 17 of Article I of our State Constitution deals primarily with eminent domain,—that is, with the taking of private property for a public use. This is a taxing statute. Taxes are burdens or charges imposed by the legislative power of the State to raise money for public purposes. The exercise of the power of eminent domain takes property—not money. The exercise of the power to tax takes money alone. City of Austin v. Nalle, 102 Texas 536, 120 S. W. 996.

Section 19 of article I of our State Constitution provides that no citizen of this State shall be deprived of his life, liberty, property, privileges, or immunities, or in any manner disfranchised, exempt by due course of the law of the land. We do not think that this constitutional provision is involved here.

As already shown, this is a taxing statute. The power to tax is inherent in sovereignty. Unless the tax here levied is prohibited by some other provision of our Constitution, or some provision of the Federal Constitution, it could not violate Section 19 of Article I of our State Constitution provides that

Section 48 of Article III of our Constitution provides that the Legislature shall not have the right to levy taxes or impose burdens upon the people, except to raise revenue sufficient for the economical administration of the Government. It is then provided that certain named purposes may be included in the power to levy taxes and impose burdens. Of course the naming of such particular purposes would not exclude other proper governmental purposes. The effect of this constitutional provision is to prohibit the Legislature from levying taxes or imposing burdens for purposes other than to administer the Government. If a tax cannot be classed as a tax to administer the Government it is unconstitutional, unless it is authorized by some other constitutional provision. The administering of Government, however, covers and embraces a very large field of action. To our minds, this Act is not antagonistis to this constitutional provision. It certainly serves a public purpose. If it does so, and does not violate some other constitutional provision, it does not violate this provision. Unemployment, with its attendant consequences and evils, is of very vital concern to the State, and to every inhabitant thereof. Unemployment always has had, and always will have, a very profound influence upon the public welfare. The evils which attended it permeate every part of our social, economic, and political structure. Unemployment bears in its wake vagrancy, crime, reduction in marriage, deterioration in health, and the destruction of family life. It not only impairs the health of the unemployed, but impairs the health of their dependents. It lessens, and often destroys, patriotic impulses. It retards the education of the youth of the land. It fosters and produces other evils too numerous to mention. This Act was intended to lessen these evils. To our minds, no court ought to say that such a purpose is outside of the administration of Government. In Dimmitt County v. Frazier (Ct. Civ. App., writ refused), 27 S. W. 829, it was held that a statute authorizing the payment of a bounty on wolves did not contravene this constitutional provision, because it was for the protection of the property of our citizens. If such a statute to accomplish such an end is for a governmental purpose, certainly this statute

should not be condemned as not being for a governmental purpose.

Section 51 of Article III of our Constitution provides that the Legislature shall have no power to make any grant or authorize the making of any grant of public moneys to any individual, association or individuals, municipal or other corporations, whatsoever. It is then provided that the Legislature may grant aid to indigent or disabled Confederate soldiers and their widows. Aid in case of public calamity is also preserved. Under the plain provisions of this constitutional provision, the Legislature is without power to grant or authorize the making of any grant of public moneys to any individual as a gratuity. If this law transgresses this constitutional provision it is unconstitutional and void. We are of the opinion, however, that unless this Act provides for the payment of gratuity out of public money, it does not transgress this constitutional provision.

**3** As already stated, the dominant purpose of this Act is to provide insurance or compensation to employees, who come under it, in times of unemployment. The class of employers who come under this Act provide or create the fund out of which the unemployed covered by the Act are paid a certain compensation for a prescribed time. To our minds such a plan should not be condemned as providing for or creating a gratuity. It is true that the employers alone directly create the unemployment fund, but it is created for the benefit of their employees. Therefore, the right of such employees to enjoy or participate in the fund in times of unemployment should be regarded as a part of their compensation or wages. All employees who labor or perform services for employers who are covered by this Act labor or serve in part for the right to enjoy the benefits of this unemployment fund. So regarded, the fund and the benefits to be derived therefrom by unemployed employees cannot be regarded as a gratuity within the meaning of Section 51 of Article III of our State Constitution. To the contrary, those who come under its provisions have labored or served for such privilege. Byrd v. City of Dallas, 118 Texas 28, 6 S. W. (2d) 738.

In the case just cited this Court had before it a statute which authorized a certain class of cities to create a pension or aid for certain of their officers and employees. The fund was created in part by payments made into the same by the

officers and employees to be benefited and in part by the City out of its own revenues. The plan authorized by the statute contemplated that the officers and employees of the City designated should receive their salaries in the usual way, and, in addition thereto, should be entitled to participate in the pension fund above described. It was held that the statute did not create or attempt to create a gratuity; but that the right to participate in the pension fund was a part of the compensaion paid for the services rendered. We think the same principle applies here. The right of an employee covered by this Act to participate in the fund created thereby is a part of the compensation earned while he is employed. To say the least, the Act can reasonably be given that construction; and that construction renders it constitutional. If the Act is susceptible of two constructions, one of which renders it constitutional and the other unconstitutional, it is our duty to adhere to the construction that squares with the Constitution.

4 Section 6 of Article VIII of our State Constitution provides that no money shall be drawn from the Treasury, but in pursuance of specific appropriations made by law; nor shall any appropriation of money be made for a longer term than two years; etc. It is argued that this Act violates this constitutional provision because it attempts to make a permanent appropriation, when such constitutional provision, by its terms, prohibits an appropriation for more than two years. To our minds, the fund above described does not come within the terms of this constitutional provision; because, as above stated, the fund is not the property of the State as such, and never goes into the State Treasury. Manion v. Lockhart, 131 Texas 175, 114 S. W. (2d) 216; Tatum v. Wheeless, 180 Miss. 800, 178 So. 95; Gillum v. Johnson, 7 Cal. (2d) 744, 62 Pac. (2d) 1037, 63 Pac. (2d) 810, 108 A. L. R. 595.

In Manion v. Lockhart, supra, this Court clearly decided that it is not in violation of our Constitution to make the State Treasurer custodian of a fund which does not belong to the State, and does not belong in the State Treasury. It is also decided that as to such fund the power of the Legislature to authorize the State Treasurer to pay it out for the purpose defined by law is not limited or circumscribed by Section 6 of Article VIII of our State Constitution. We quote the following from Judge Sharp's opinion in the Manion case:

"A careful analysis of the objects sought to be attained

by the passage of these articles, 3644 to 3660, clearly excludes the idea that the money should be placed in the general revenue fund and be subject to payment only by legislative appropriations. Nor do we think that the provisions of articles 4371 and 4386 of the Revised Civil Statutes, as amended, Vernon's Ann. Civ. St. arts. 4371, 4386, control this case, or that the Legislature intended, by enactment of those two articles, to amend or change the mode of procedure described in articles 3644 to 3660, The clear purpose of the law, as we construe it, is that the Treasurer shall keep a record of such funds, and be prepared to pay claimants the amounts due them when the law has been complied with. In other words, the State Treasurer becomes a custodian or trustee by virtue of the articles of the statute. Smith et al v. Paschal et al, Tex. Com. App., 1 S. W. (2d) 1086."

In Tatum v. Wheeless, the Supreme Court of Mississippi had before it the unemployment compensation staute of that State. Such statute is practically, if not wholly, the same as the Texas statute. It seems that Mississippi has a constitutional provision that requires that the Legislature shall definitely fix the maximum sum of any appropriation made by it. It was contended that the Act violates such provision. The Court rejected such contention on the ground that the fund did not belong to the State in its sovereign capacity; that it was not to be placed in the State Treasury, but was a trust fund, to be held and applied for the benefits of a class of employees, in the nature of unemployment insurance, as is provided by law. We quote the following from the opinion:

"It is urged, also, that the act violates section 63 of the State Constitution, providing that no appropriation bill shall be passed by the Legislature which does not fix definitely the maximum sum thereby appropriated to be drawn from the treasury. A sufficient answer to this contention is that the fund here provided for and collected is not a fund for the general purposes of running the state government, or providing for the expense of operating the state government. The fund here created is not to be placed in the state treasury—it is a trust fund to be held and applied for the benefits of a class of employees, in the nature of unemployment insurance, and is authorized by law. In other words, the funds here provided are trust funds and do not belong to the state in its sovereign capacity, but are for the benefit of a group from whose wages, or from whose employers, money is taken, and is compensation

in the nature of wages, although, in form, an excise on the right to do business in the state. This was held to be permissible in United States v. Butler, 297 U. S. 1, 56 S. Ct. 312, 80 L. Ed. 477, 102 A. L. R. 914."

In the opinion in Tatum v. Wheeless, supra, it also appears that the Constitution of Mississippi contains the following provision:

"No bill passed after the adoption of this Constitution to make appropriations of money out of the state treasury shall continue in force more than six months after the meeing of the Legislature at its next regular session; nor shall such bill be passed except by votes of a majority of all the members elected to each house of the Legislature."

It was contended that the Mississippi Act violated the above-quoted constiutional provision. The court overruled such contention. We quote again from the opinion as follows:

"As this money is not property to be put into the state treasury, but is to be held by the state treasurer, who is authorized to place it in the depositories, and to keep it apart and separate from the general funds of the state, it does not fall within the provisions of section 64 of the Constitution."

In Gillum v. Johnson, supra, the Supreme Court of California had before it the California Unemployment Compensation Act, very similar to, if not the same as, ours. The court held that the fund was not public money in the sense that it would require an appropriation other than required by the Act. We quote as follows from the opinion:

"It must be conceded that the moneys so contributed under the Act are not public moneys in the sense that they are subject to appropriation other than as provided in the Act."

From what we have said it is evident that we hold that this Act does not violate Section 6 of Article VIII of our State Constitution. This holding is not in conflict with our holding in Dallas County v. McCombs, 135 Texas 272, 140 S. W. (2d) 1109. In that case the general ad valorem tax revenues of the State were involved. The money attempted to be appropriated was money that was the property of the State in its sovereign capacity. It was levied and collected as such. In other words, the funds attempted to be appropriated in the McCombs case

were ad valorem taxes, levied and collected as such under authority of Section 9 of Article VIII of our State Constitution. The money here involved is not the property of the State in any capacity, but is a trust fund to be held out of the State Treasury, but in the hands of the State Treasurer as trustee, for the benefit of a class of employees whose employers pay it in by virtue of a tax levied, the tax being in the nature of an excise tax.

Still discussing the question as to whether this Act violates Section 6 of Article VIII of our State Constitution, we are of the opinion that, even if it should be held that such constitutional provision applies to the fund here involved, that fact would not invalidate the entire Act. The Legislature can comply with the above constitutional provision by making an appropriation each biennium of the money in the fund for the purposes for which it was collected, as defined by the Act. We here pause to note that this suit involves no question in regard to the paying out of money,—the opposite is involved here.

It is argued that because the Legislature saw fit to submit to the people for adoption Sections 48, 51a, 51b, 51c, and 51d, and the Confederate aid provisions of Section 51, all of Article III of our State Constitution, it is indicated that the Legislature was of the opinion that such amendments were necessary in order to clothe that department of government with authority to pass laws to accomplish the purposes of such amendments. It seems to be then argued that if it was necessary to amend the Constitution in the instance above mentioned, to enable the Legislature to pass laws to accomplish their purposes, it is necessary to amend the Constitution to enable the Legislature to accomplish the purposes of this Act. To express ourselves in a homely way, the above constitutional amendments constitute grist already ground. We are not called upon, and will never be called upon, to pass on the necessity for the above amendments, and we expressly do not do so here, one way or the other. We will say, however, that the history of the submission of constitutional amendments in this State will prove that not all of them have been submitted in order to create a legislative power. Some few have undoubtedly been submitted to ascertain the will of the people, and to enable them to express such will regarding a governmental policy.

We freely confess that some of the provisions of this Act present very difficult questions of constitutional law. Our Con-

stitution divides the powers of government into three distinct departments: those which are legislative; those which are executive; and those which are judicial. No person or collection of persons being of one of these departments has any right to exercise any power properly attached to either of the others, except in the instances provided by the Constitution. Article II. The very life of our republican form of government demands that each of the three co-ordinate branches thereof shall operate within its constitutional limitations. It is the exclusive right and duty of the legislative branch of government to determine the wisdom of legislation. The judicial branch has no right or power to invade that legislative prerogative. It is not only the right, but it is the duty of the judicial branch to determine whether or not a legislative Act contravenes or antagonizes the fundamental law; and in determining such we are unalterably wedded to the principle that the Constitution means what it meant when it was written. In spite of this, a statute is presumed to be constitutional, and every reasonable doubt as to the validity of an Act must be resolved in its favor. Measured by the above rules and principles, we hold that we are not justified in saying that this Act violates any part of our State Constitution.

The question certified is answered, "No."

Opinion delivered April 9, 1941.

MR. CHIEF JUSTICE ALEXANDER, dissenting.

I regret that I am unable to agree with my associates on the constitutionality of the Act in question. Said Act, the Unemployment Compensation Act, compels employers to contribute funds to be used in paying unemployment compensation to their employees during the term of their unemployment. The employees make no contributions whatever to the funds. The employers make all the contributions, and the funds are payable to the employees upon their becoming unemployed, without the necessity of a showing of indigent circumstances.

That the contributions exacted of the designated employers under the terms of the Act constitute a tax, can hardly be doubted. A tax is sometimes defined as a forced contribution of wealth to meet the public needs of the government (Webster's New International Dictionary), or as an enforced burden levied by legislative authority for a public purpose. 1 C. J.,

65. The burden imposed by the Act here under consideration meets all of these requirements. In fact, the preamble of the Act itself refers to such contribution as a "tax." See also Beeland Wholesale Co. v. Kaufman, 234 Ala. 249, 174 So. 516; Carmichael v. Southern Coal & Coke Co., 301 U. S. 495, 57 S. Ct. 868, 871, 81 L. Ed. 1245, 1255, 109 A. L. R. 1327; Lally v. State, 138 S. W. (2d) 1111, par. 1; Texas Unemployment Compensation Commission et al v. Campbell, Wise & Wright, Inc., et al, 119 S. W. (2d) 388; Independent Gasoline Co. v. Bureau of Unemployment Compensation, 190 Geo. 613, 10 S. E. (2d) 58. Since the majority opinion concedes that the funds so exacted of employers under the Act constitute a tax, I deem further discusison of this phase of the question unnecessary.

The majority opinion seems to hold that the funds exacted from the employers under the terms of the Act are not public or State funds. In fact, it is said in the opinion: "The money collected for such fund,—though levied and collected in the form of excise taxes,—is not levied or collected to become a fund of the State as such. The taxes are levied and collected for such fund, and not for the State in its sovereign capacity. * * * To our minds, the fund above described does not come within the terms of this constitutional provision; because, as above stated, *the fund is not the property of the State as such,* and never goes into the State Treasury. * * * The money here involved is not the property of the State in any capacity, but is a trust fund to be held out of the State Treasury, but in the hands of the State Treasurer as trustee, for the benefit of a class of employees whose employers pay it in by virtue of a tax levied, the tax being in the nature of an excise tax." If in fact this is not a State fund, collected by the State *in its sovereign capacity,* then the Act authorizing the collection thereof is void, for our Constitution expressly provides that, "Taxes shall be levied and collected by general laws and for *public purposes only.*" (Italics mine.) Constitution, Article VIII, Section 3. It also provides: "The Legislature shall not have the right to levy taxes or impose burdens upon the people, except to raise revenue sufficient for the economical administration of the government, * * *." Constitution, Article III, Section 48. Under these provisions of the Constitution the taxing power of this State cannot be used to raise money for private purposes. It can be used only to raise money for public purposes for the economical administration of the government; and, consequently, any fund so raised must necessarily be

classed as a State fund or as a public fund. City of Dallas v. Trammell, 129 Texas 150, 101 S. W. (2d) 1009, 112 A. L. R. 997; Texas Pharmaceutical Assn. v. Dooley (Tex. Civ. App.), 90 S. W. (2d) 328. Otherwise there would be no constitutional authority for the collection thereof, and this in itself would render the Act void. As said by Chief Justice Phillips in Waples et al v. Marrast, 108 Texas 5, 184 S. W. 180, par. 4, L. R. A. 1917a, 253; "Taxes are burdens imposed for the support of the government. They are laid as a means of providing public revenues for public purposes. The sovereign power of the State may be exercised in their levy and collection only upon the condition that they shall be devoted to such purposes; and no lawful tax can be laid for a different purpose. Whenever they are imposed for private purposes, as was said in Broadhead v. Milwaukee, 19 Wis. 624, 670, 88 Am. Dec. 711, it ceases to be taxation and becomes plunder." See also Goodnight v. City of Wellington, 118 Texas 207, 13 S. W. (2d) 353; 40 Tex. Jur., 14.

We therefore approach the question as to whether the Legislature had the right to authorize the use of such public funds in the manner provided for in the Act. Our Constitution, Article III, Section 51, provides as follows: "The Legislature shall have no power to make any grant of any public moneys to any individual, association of individuals, municipal or other corporations whatsoever"; except (a) to provide compensations for indigent and disabled Confrederate veterans and sailors; (b) the issuance of bonds in the year 1933 in the sum of $20,000,000, to be used to relieve the hardships of needy and distressed people resulting from unemployment; (c) old age assistance; (d) compensation for the needy blind; and (e) assistance to destitute children under the age of fourteen. The grant that is prohibited by this section of the Constitution contemplates and includes any gratuity or payment of public funds directly to any individual, for any purpose other than in return for services rendered or other property rights. Byrd v. City of Dallas, 118 Texas 28, 6 S. W. (2d) 738; Rhoads Drilling Co. v. Allred, 123 Texas 229, 70 S. W. (2d) 576; Dallas County v. Lively, 106 Texas 364, 167 S. W. 219; Jones v. Williams, 121 Texas 94, 45 S. W. (2d) 130, 79 A. L. R. 983; City of Aransas Pass v. Keeling, 112 Texas 339, 247 S. W. 818; Bexar County v. Linden, 110 Texas 339, 220 S. W. 761; State v. Bradford, 121 Texas 515, 50 S. W. (2d) 1065; Henson v. Commissioners' Court of Henderson County (Tex. Civ. App.), 56 S. W. (2d) 240. In Byrd v. City of Dallas,

supra, a pension authorized by the voters of the City of Dallas in favor of city firemen was upheld, on the ground that the pension was a part of the compensation contemplated by the contract of hire to be paid for services rendered by such employees. In discussing this question, however, the court said: "That portion of title 109 of the Revised Statutes referred to in the certificate is not in anywise obnoxious to the provisions of the Constitution cited. Without discussing in detail these provisions of the Constitution, it is sufficient to say each of them is intended to prevent the application of public funds to private purposes; in other words, to prevent the gratuitous grant of such funds to any individual, corporation, or purpose whatsoever. This limitation upon the power of the Legislature is a wholesome one and is plainly stated in unequivocal terms. It is academic to say the Legislature has power to pass any law which its wisdom suggests that is not forbidden by some provisions of the Constitution (federal or state). If the pension provided for in this Act is a gratuity of donation to the beneficiary, it is clearly forbidden by the fundamental law." It was held in the case just quoted from that the pension therein provided for was not a gratuity, but was a part of the compensation agreed to be paid by the City to its employees. That holding can be fully justified, because there the City *voluntarily* agreed in advance that, if its firemen would work for the City a definite time, the City would pay them, in addition to their monthly salary, a pension under certain stipulated conditions. That a contract was entered into *voluntarily* by the parties, and the pension was rightly classified as a part of the compensation *agreed* to be paid to such employees for their services. In the case at bar the contract is *not a voluntary one* on the part of the employers. They are *compelled* to make the so-called "contributions" by the strong arm of the law in the exercise of its taxing power. The relation, therefore, is not a contractual one, and the funds so exacted of the employers cannot be classified as a part of the compensation *agreed* to be paid by the employers.

Our Workmen's Compensation Law was sustained only on the theory that the relation created thereby was a voluntary one. There the employer could refuse to become a subscriber to the Act, and the employee could refuse to work for an employer who was a subscriber. The employer by taking out compensation insurance, and the employee by accepting employment with such a subscriber, thereby *consented* to abide by the provisions of the Act. It is interesting to note, however, what

Chief Justice Phillips said would be the effect but for such consent. In this connection it was said: "There is no such thing in this country as taking one man's property without his consent and giving it to another by legislative edict. That is nothing less than confiscation by legislative decree. If this Act, therefore, had declared an employer *not consenting* to its provisions absolutely liable in damages at the suit of an employee for any injuries sustained by the latter in the employment, without reference to any wrong or breach of duty committed by the employer, it would have been void. Such a law would have amounted to a legislative forfeiture of property rights, regardless of the holding of any court upon the question." Middleton v. Texas Power & Light Co., 108 Texas 96, 178 S. W. 556. The Act here under consideration has no element of consent on the part of the employers. This is a plain case, in the language of Chief Justice Phillips, of "taking one man's property without his consent and giving it to another by legislative edict."

It is not contended that the laborers coming within the meaning of the Act here under consideration are employees of the State, or of any municipal branch thereof, or that they have ever delivered any property to or rendered any service for the State, in return for the benefits to be paid to them under the Act. So far as they are concerned, it is a pure gratuity. It is not required that such employees who are to receive the benefits be in necessitous circumstances. They may be as wealthy as the employers, and yet they are to receive the funds so exacted from the employers through the taxing power of the State. The Act contemplates a direct grant to the individuals, and not merely the maintenance of an institution, such as a school, asylum, or bureau for their assistance. Very clearly, therefore, the Act provides for a direct grant of public moneys to individuals, and is necessarily in conflict with the express provisions of Article III Section 51 of our Constitution as above set out.

In this respect it should be noted that our State Legislature is not invested with that broad and unrestricted authority in the use of public funds as is the Congress of the United States. It has been held in numerous cases that Congress may make grants or gratuitous payments of public funds to individuals without the necessity of pre-existing legal liability therefor. United States v. Realty Co., 163 U. S. 427, 440, 16 Sup. Ca. 1120, 41 L. Ed. 215; Work v. Rives, 267 U. S. 175,

182, 45 Sup. Ct. 252, 69 L. Ed. 561. No such right exists in the Legislature of the State of Texas. The people of Texas, for reasons satisfactory to themselves, have seen fit to prohibit, by express constitutional provision, the making of such grants; and any such gratuitous payments contrary to the Constitution are void.

That my interpretation of the Constitution in this respect is correct is not only sustained by a logical interpretation of the language used in the Constitution itself, and by the authorities above cited, but by the unbroken line of conduct on the part of the Legislature and the people themselves in the past. At six different times since the adoption of the Constitution in 1876, occasions have arisen in which it was deemed necessary to make direct grants to citizens of the State. In 1895 it was thought proper to make grants in favor of indigent Confederate veterans and sailors and their dependents; in 1933 it was thought that grants should be made in favor of needy people who were in distress because of unemployment; in 1935 it was deemed necessary to make grants for old age assistance to citizens over 65 years of age; in 1936 it was deemed necessary to make grants in favor of retired school employees (see Article III, Section 48a, of the Constitution); in 1937 it was deemed necessary to make grants in favor of the needy blind; and in the same year it was deemed necessary to make grants in favor of destitute children under the age of 14 years. See amendments to Article III, Section 51, of the Constitution. It is significant that in each of these instances it was deemed necessary, both by the Legislature and by the people, that an amendment to the Constitution should first be submitted to and adopted by the people before the grant could be made. It is a well-established rule that the construction which the parties have put on a written instrument, as evidenced by their conduct thereunder,—that is, what they have done in compliance with its provisions,—has great weight in determining the true meaning of the instrument. That rule applies with equal force here. The fact that all down through the years, for a period of more than 60 years, the people and the Legislature have deemed an amendment to the Constitution necessary, in order to authorize such a grant, argues mightily in favor of the view that such special constitutional authority was necessary before such a grant could be made by the Legislature. Certainly the public purpose was as apparent and the demand was as pressing for the Government to grant direct aid to the indigent Confederate veterans who had fought in behalf

of the State, or to the needy blind, or to destitute children of tender years, as it was to grant such aid to laborers merely because they were temporarily unemployed, and regardless of whether they were in indigent circumstances. Yet in each instance it was deemed necessary to secure the approval of the people by a direct vote on the subject before the aid could be granted.

Since the Act here under consideration provides for direct grant of public funds to individuals who do not come within any of the exceptions provided for in the Constitution, it is in conflict with the provisions of Article III, Section 51, of our Constitution, and is therefore, in my opinion, unconstitutional and void.

I am also of the opinion that the Act in question conflicts with the Constitution in another respect. Article VIII, Section 6, of our Constitution provides as follows:

"Sec. 6. No money shall be drawn from the Treasury but in pursuance of specific appropriations made by law; nor shall any appropriation of money be made for a longer term than two years, except by the first Legislature to assemble under this Constitution, which may make the necessary appropriations to carry on the government until the assemblage of the sixteenth Legislature."

Section 5221b-7(c) of the Act here under consideration directs that when the funds therein provided for are collected, they shall be deposited with the State Treasurer. He in turn is directed to deposit them in the Unemployment Trust Fund of the Federal Government; and such funds are to be withdrawn only for the payment of the benefits provided for under the Act. The Commission may requisition such funds, and pay them out from time to time, as is necessary for the payments provided for in the Act. The Act itself expressly provides: "Expenditures of such moneys in the benefit account and refunds from the clearing account shall not be subject to any provisions of law requiring specific appropriations or other formal release by State officers of money in their custody." It takes no argument to demonstrate that there is an irreconcilable conflict between these provisions of the Act and the above-quoted provisions of the Constitution. The Act provides that the funds may be paid out without specific appropriations; whereas the Constitution, in language that cannot be mis-

understood, provides that no money shall be drawn from the treasury except in pursuance of specific appropriations made by law. The conflict between the terms of the two provisions cannot be made clearer than is made by the provisions themselves. The Treasurer cannot pay out the funds on the requisition of the Commission without a specific appropriation and at the same time obey the provisions of the Constitution, which forbid the paying out of public funds without a specific appropriation. If the provisions of the Constitution requiring specific appropriations by the Legislature before public funds are to be paid out of the treasury, are to stand, then the provisions of the Act authorizing the expenditure of these funds without an appropriation by the Legislature must fall, because the two provisions cannot be observed at the same time. The Constitution of the State of California provides: "No money shall be drawn from the treasury but in consequence of appropriation made by law, and upon warrants duly drawn thereon by the Controller." The Supreme Court of that State, in Gillum v. Johnson, 7 Calif. (2d) 744, 62 Pac. (2d) 1037, secs. 4 and 5, held that funds collected under a companion act could be paid out without any other appropriation other than that given in the Act itself, because the appropriation thereby made was a *continuing* one. It should be noted, however, that the Constitution there under consideration did not provide, as ours does, that no appropriation shall ever be made for a longer term than two years. Under our Constitution there can be no such thing as a *continuing* appropriation for an indefinite period of more than two years. See National Biscuit Co. v. State, 134 Texas 293, 135 S. W. (2d) 687, sec. 8; Pickle v. Finley, 91 Texas 484, 44 S. W. 480; 38 Tex. Jur., 844. There is, therefore, a direct conflict between the provisions of this Act and the foregoing constitutional provision.

I think that this last defect could be corrected by an appropriation each two years, but the defect first referred to appears to be incurable. In my opinion, the Act ought to be held unconstitutional.

Opinion delivered April 9, 1941.

### ON MOTION FOR REHEARING.

This case is before us on motion for rehearing filed by American Surety Company of New York. In such motion the Surety Company Contends that we were in error in all the

rulings contained in our original opinion, and in addition thereto presents a question of constitutional law not formerly discussed or decided. We deem it proper to here discuss and decide such additional question.

During the time pertinent to this case Subdivision (e) of Article 5221b-17 read as follows:

"(e) 'Employing unit' means any individual or type of organization, including any partnership, association, trust, estate, joint-stock company, insurance company, or corporation, whether domestic or foreign, or the receiver, trustee in bankruptcy, trustee or successor thereof,. or the legal representative of a deceased person, which has or subsequent to January 1, 1936, had in its employ one or more individuals performing services for it within this State. All individuals performing services within this State for any employing unit which maintains two or more separate establishments within this State shall be deemed to be employed by a single employing unit for all purposes of this Act. Whenever any employing unit contracts with or has under it any contractor or subcontractor for any work which is a part of its usual trade, occupation, profession, or business, unless the employing unit as well as each such contractor or subcontractor is an employer by reason of Section 19(f) or Section 8(c) of this Act, the employing unit shall for all the purposes of this Act be deemed to employ each individual in the employ of each such contractor or subcontractor for each day during which such individual is engaged in performing such work; except that each such contractor or subcontractor who is an employer by reason of Section 19(f) or Section 8(c) of this Act shall alone be liable for the contributions measured by wages payable to individuals in his employ, and except that any employing unit who shall become liable for any pay contributions with respect to individuals in the employ of any such contractor or subcontractor who is not an employer by reason of Section 19(f) or Section 8 (c) of this Act, may recover the same from such contractor or subcontractor. Each individual employed to perform or to assist in performing the work of any agent or employee of an employing unit shall be deemed to be employed by such employing unit for all the purposes of this Act, whether such individual was hired or paid directly by such employing unit or by such agent or employee, provided the employing unit had actual or constructive knowledge of the work."

Effective since the time involved in this case the above-

quoted statute has been amended so that it now reads as follows:

"(e) 'Employing unit' means any individual or type of organization, including any partnership, association, trust, estate, joint-stock company, insurance company, or corporation, whether domestic or foreign, or the receiver, trustees in bankruptcy, trustee or successor thereof, or the legal representative of a deceased peson, which has or subsequent to January 1, 1936, had in its employ one or more individuals performing services for it within this State. All individuals performing services within this State for any employing unit which maintains two or more separate establishments within this State shall be deemed to be employed by a single employing unit for all purposes of this Act. Each individual employed to perform or to assist in performing the work of any agent or employee of an employing unit shall be deemed to be employed by such employing unit for all the purposes of this Act, whether such individual was hired or paid directly by such employing unit or by such agent or employee, provided the employing unit had actual or constructive knowledge of the work."

A reading of the above statutes will disclose that the present statute is exactly the same as the original, except that the present statute does not contain the following provisions which were contained in the original statute:

"Whenever any employing unit contracts with or has under it any contractor or subcontractor for any employment which is a part of its usual trade, occupation, profession, or business, unless the employing unit as well as each such contractor or subcontractor is an employer by reason of Section 19(f) or Section 8(c) of this Act, the employing unit shall for all the purposes of this Act be deemed to employ each individual in the employ of each such contractor or subcontractor for each day during which such individual is engaged in performing such employment; except that each such contractor or subcontractor who is an employer by reason of Section 19(f) or Section 8(c) of this Act shall alone be liable for the contributions measured by wages payable to individuals in his employ, and except that any employing unit who has become liable for any pay contributions with respect to individuals in the employ of any such contractor or subcontractor who is not an employer by reason of Section 19(f) or Section 8(c) of this Act, may recover the same from such contractor or subcontractor."

As pertinent to the facts of this case, Subdivision (e), supra, of our Unemployment Compensation Statutes prior to amendment, in effect, provided that if any employing unit which employed eight or more employees should subcontract with another employing unit which did not employ as many as eight employees, the employing unit with eight or more employeees should be liable for the taxes levied by the Act, measure by the wages paid to his own employees and also by the wages paid by the subcontractor. It was then provided that the contractor paying such taxes could recover from the subcontractor the taxes paid on account of the wages paid by the subcontractor.

In the case at bar the original contractor employed more than eight employees. He therefore came within the taxing provisions of the Act under consideration. The contractor sublet a part of his contract to a subcontractor who did not employ as many as eight employees. Such subcontractor therefore did not come within the taxing provisions of the Act. The contractor paid the taxes occasioned by the wages of the employees of the subcontractor as well as the taxes occasioned by the wages of his own employees. Under the provisions of the law then in force giving him that right, the contractor is here suing to recover for the taxes paid by him occasioned by the wages of the employees of the subcontractor. The American Surety Company, the surety of the subcontractor, contends that the part of Subdivision (e) in force at the time here involved, which required the subcontractor, not taxed, to reimburse the contractor, taxed, for the taxes levied against and paid by the contractor on account of the wages of the employees of the subcontractor, was unconstitutional and void because in violation of Section 19 of Article I of our State Constitution. Such constitutional provision provides: "No citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land."

5 We overrule the above contention. The subcontractor contracted with the contractor. The Legislature certainly had a right to regulate such contracts. When the subcontractor contracted with the contractor, the pertinent provisions of our Unemployment Compensation Statutes applied to and became a part of such contract. Such statutes required this contractor to pay taxes, counting the wages paid by this subcontractor as his own. Such statute also required the subcontractor to reim-

burse the contractor. It follows that this subcontractor con-
tracted to make such reimbursement. Strickland v. Natalbany
Lumber Co. (La. Ct. of App.), 200 So. 652. We think the prin-
ciple of contract law upheld by this Court in Middleton v.
Texas Power & Light Co., 108 Texas 96, 185 S. W. 556, ap-
plies here.

We have carefully read and considered this motion for
rehearing as touching all other questions decided in our original
opinion, and still adhere to the views expressed in such opinion.

Chief Justice Alexander aheres to the views expressed in
his dissenting opinion. Granting, however, that the original
opinion of the majority of the Court in this case is correct,
Judge Alexander does not dissent from this opinion.

The motion for rehearing above mentioned is in all things
overruled.

Opinion delivered May 28, 1941.