

# THE ATTORNEY GENERAL
# OF TEXAS

### AUSTIN 11, TEXAS

PRICE DANIEL
ATTORNEY GENERAL

June 28, 1951

Hon. Allan Shivers
Governor of Texas
Austin, Texas

Opinion No. V-1198

Re: Constitutionality of House
Bill No. 603, authorizing
agreements between the
State of Texas and the Fed-
eral Government to extend
Federal old-age and survi-
vors insurance coverage to
certain public employees.

Dear Governor:

You have requested the opinion of this office on the
constitutionality of House Bill 603.

House Bill 603 provides that the State Department of
Public Welfare, hereafter referred to as the State Agency, shall
administer the provisions of the Act. The State Agency is author-
ized to enter into agreements with the Federal Security Adminis-
trator for the purpose of extending Federal old-age and survivors
insurance coverage to employees of any of the counties or munic-
ipalities of the State other than employees engaged in performing
services in connection with a proprietary function.

The State Agency is authorized to enter into agree-
ments with the governing bodies of eligible counties and munic-
ipalities when such counties and municipalities desire old-age and
survivors insurance coverage for employees covered by the Act.
The term "employee" is defined as including an officer or employ-
ee of a county or municipality. H.B. 603, Sec. 1(c).

Section 8 reads, in part, as follows:

"Each county or municipality as to which a plan
has been approved . . . shall pay to the State Agency
. . . contributions in the amounts and at the rates spec-
ified by the applicable agreement. . . . Counties or
municipalities . . . are authorized, in consideration of
the employees retention in or entry upon employment,
to impose upon its employees . . . a contribution with
respect to wages in keeping with applicable State and
Federal requirements. Contributions so collected
shall be paid to the State Agency in partial discharge
of the liability of the county or municipality, but failure

to deduct contributions from employees' wages shall
not relieve the employee or the employer of liability
for the contribution. . . . Matching contributions by
the employing counties or municipalities . . . shall be
paid from the respective source of funds from which
covered employees receive their compensation."

The respective governing bodies of the various counties or municipalities are authorized to pay out of any available funds not otherwise dedicated such amounts as may be necessary to finance their proportionate share of the administrative cost of the program at the State level. At the end of each fiscal year, the State Agency must pay from the Social Security Administration Fund to the State Treasurer for deposit to the General Revenue Fund of the State of Texas an amount not less than ten per cent (10%) of the payments made to such fund during the preceding year until such time as the amount appropriated to the State Agency from funds of the State for administrative purposes has been reimbursed in full.

Section 11 empowers the State Agency to collect any delinquencies and interest thereon from counties and municipalities. Likewise, the State Agency "may direct the deduction of any delinquent payments with interest from any moneys payable to the delinquent county or municipality by the State or any department or agency of the State, provided, however, that deductions shall be made only from such prior appropriations as were expressly made subject to such deductions. The Comptroller and the State Treasurer are empowered and directed to comply with the State Agency's deduction directives and to remit the deducted amounts to the State Agency in trust for the contributions of the delinquent county or municipality."

Section 6 provides that the respective governing bodies of such counties and municipalities as enter into agreements with the State Agency under the Act are authorized to pay contributions as required by these agreements from those funds from which the covered employees receive their compensation and "it is expressly provided that all prior laws and parts of laws which fix a maximum compensation for any covered employees of counties are hereby amended to allow payment of the matching contribution necessary to this program in addition to any maximum compensation otherwise fixed by law."

Section 7 of the Act authorizes counties and municipalities to submit for approval by the State Agency plans for extending the benefits of the Federal old-age and survivors insurance system to the employees of the county or municipality other than those engaged in performing services in connection with a proprietary

function of the subdivision. Submitted plans must meet stated requirements, one of which is that each plan must specify the source or sources from which the funds necessary to make the payments required are to be derived and must contain guarantees that these sources will be adequate for this purpose. The State Agency may require guarantees in the form of surety bonds, advance payments into escrow, detailed representations and assurances of priority dedication, or any legal undertaking to create adequate security that each county or municipality will be financially responsible for its share in the program for at least a minimum period equivalent to that specified by Federal requirements to precede coverage cancellation.

Section 12 establishes "a special fund, separate and apart from all public moneys or funds of this State, to be known as the Social Security Fund, which shall be administered as directed by the State Agency exclusively for the purposes of this Act. The State Treasurer shall be treasurer and custodian of the fund. He shall administer such fund in accordance with the directions of the State Agency, and the Comptroller shall issue warrants upon it in accordance with such regulations as the State Agency shall prescribe. The State Agency shall deposit all moneys collected under the provisions of this Act, except moneys to defray administrative expenses at the State level, in the Social Security Fund. All moneys so deposited with the State Treasurer in the Social Security Fund shall be held in trust, separate and apart from all public moneys or funds of this State. The State Agency is vested with full power, authority, and jurisdiction over the fund and may perform any and all acts necessary to the administration thereof and to pay the amounts required to be paid to the appropriate Federal authorities and any refunds or adjustments necessary under this Act."

Moneys collected from counties and municipalities to defray the cost of administrative expenses are to be deposited in another special fund of which the State Treasurer is made treasurer and custodian subject to the directions of the State Agency. The moneys in both funds are to be disbursed upon warrants issued by the Comptroller of Public Accounts pursuant to sworn vouchers executed by the State Agency. Section 13 states that "These funds will not be State funds, and shall not be subject to legislative appropriation."

Section 14 appropriates the sum of $20,000.00 to the State Agency "for the purposes enumerated in Section 13 and to investigate, study, negotiate, defend, and administer this program during the two (2) years immediately succeeding the effective date of this Act."

Section 15 contains the usual severability clause and Section 16 declares an emergency.

House Bill 603 is designed to take advantage of Section 106 of the "Social Security Act Amendments of 1950." Public Law 734--81st Cong. Section 106 amended Title 2 of the Social Security Act by adding Section 218. (42 U.S.C.A. Sec. 418.)

The first paragraph of Section 218 reads as follows:

"(a)(1) The Administrator shall, at the request of any State, enter into an agreement with such State for the purpose of extending the insurance system established by this title to services performed by individuals as employees of such State or any political subdivision thereof. Each such agreement shall contain such provisions, not inconsistent with the provisions of this section, as the State may request."

Section 218(b) defines certain terms used in Section 218. The term "coverage group" is defined as follows:

"(5) The term 'coverage group' means (A) employees of the State other than those engaged in performing services in connection with a proprietary function; (B) employees of a political subdivision of a State other than those engaged in performing service in connection with a proprietary function; (C) employees of a State engaged in performing service in connection with a single proprietary function; or (D) employees of a political subdivision of a State engaged in performing service in connection with a single proprietary function. . . ."

Paragraph (c)(1) of Section 218 reads as follows:

"An agreement under this section shall be applicable to any one or more coverage groups designated by the State."

Paragraphs (c)(2), (c)(3), (c)(5), and (c)(6) deal with the services to be included in agreements relating or applicable to each coverage group.

Paragraph (c)(4) provides that prior agreements with a State may be modified so as to include any coverage group to which prior agreements have not applied or so as to include services previously excluded from the agreement consistently with the provisions of the section of the Act applicable in the case of an original agreement.

We quote in full the following paragraphs of Section 218:

"(d) No agreement with any State may be made applicable (either in the original agreement or by any modification thereof) to any service performed by employees as members of any coverage group in positions covered by a retirement system on the date such agreement is made applicable to such coverage group."

"(e) Each agreement under this section shall provide--

"(1) that the State will pay to the Secretary of the Treasury, at such time or times as the Administrator may by regulations prescribe, amounts equivalent to the sum of the taxes which would be imposed by sections 1400 and 1410 of the Internal Revenue Code if the services of employees covered by the agreement constituted employment as defined in section 1426 of such code; and

"(2) that the State will comply with such regulations relating to payments and reports as the Administrator may prescribe to carry out the purposes of this section."

"(g)(1) Upon giving at least two years' advance notice in writing to the Administrator, a State may terminate, effective at the end of a calendar quarter specified in the notice, its agreement with the Administrator either--

"(A) in its entirety, but only if the agreement has been in effect from its effective date for not less than five years prior to the receipt of such notice; or

"(B) with respect to any coverage group designated by the State, but only if the agreement has been in effect with respect to such coverage group for not less than five years prior to the receipt of such notice.

"(2) If the Administrator, after reasonable notice and opportunity for hearing to a State with whom he has entered into an agreement pursuant to this section, finds that the State has failed or is no longer legally able to comply substantially with any provision of such agreement or of this section, he shall notify such State that the agreement will be terminated in its

entirety, or with respect to any one or more cover-
age groups designated by him, at such time, not later
than two years from the date of such notice, as he
deems appropriate, unless prior to such time he finds
that there no longer is any such failure or that the
cause for such legal inability has been removed.

"(3) If any agreement entered into under this
section is terminated in its entirety, the Administra-
tor and the State may not again enter into an agree-
ment pursuant to this section. If any such agreement
is terminated with respect to any coverage group, the
Administrator and the State may not thereafter modify
such agreement so as to again make the agreement
applicable with respect to such coverage group."

"(j) In case any State does not make, at the time
or times due, the payments provided for under an a-
greement pursuant to this section, there shall be added,
as part of the amounts due, interest at the rate of 6
per centum per annum from the date due until paid, and
the Administrator may, in his discretion, deduct such
amounts plus interest from any amounts certified by
him to the Secretary of the Treasury for payment to
such State under any other provision of this Act. A-
mounts so deducted shall be deemed to have been paid
to the State under such other provision of this Act.
Amounts equal to the amounts deducted under this sub-
section are hereby appropriated to the Trust Fund."

"(k) The Administrator may, at the request of
any instrumentality of two or more States, enter into
an agreement with such instrumentality for the purpose
of extending the insurance system established by this
title to services performed by individuals as employees
of such instrumentality. Such agreement, to the extent
practicable, shall be governed by the provisions of this
section applicable in the case of an agreement with a
State."

It is clear from the above summary of House Bill 603
that its provisions devolve financial responsibility upon participat-
ing counties and municipalities. In other words, the State Agency
will simply receive or, if necessary, collect the payments due
from the counties and municipalities and will transmit the proper
portion of said payments to the Secretary of the Treasury of the
United States. The authorization to the governing bodies of such
counties and municipalities as obtain coverage for their employees
to meet this financial obligation by paying contributions in the

amount required by the Federal Act from funds from which the covered employees receive their compensation (H.B. 103, Sec.6) is not obnoxious to Sections 51 and 52 of Article III of the Constitution of the State of Texas nor to Section 3 of Article VIII.[1] This is so because House Bill 603 does not authorize or attempt to authorize a gratuity. The employee's right to receive the coverage benefits will be a part of the agreed compensation paid for services rendered. Byrd v. City of Dallas, 118 Tex. 28, 6 S.W.2d 738 (1928); Friedman v. American Surety Co. of New York, 137 Tex. 149, 151 S.W.2d 570, 578 (1941).

Despite the fact that House Bill 603 contemplates that participating counties and municipalities--not the State--shall shoulder the financial burdens incident to obtaining coverage for their officers and employees, it is equally clear that the Federal Act requires the State to be the responsible party to any agreement with the Administrator for coverage for such officers and employees. Under the Federal Act the State is the only party authorized to enter into agreements with the Administrator, Sec. 218 (a)(1), and to modify or terminate such agreements, Sec. 218(c)(4) and Sec. 218(g). The State must make the payments and reports required by the Act, Sec. 218(e); and, in the event the State does not make the payments provided for under the agreement at the time said payments are due, six per cent interest will be added thereto until paid; and the amount due, plus such interest, may, in the discretion of the Administrator, be deducted from payments to the State under any other provision of the Social Security Act, and shall be deemed to have been paid to the State under such other provision, Sec. 218(j).

---

[1] The pertinent portions of these constitutional provisions read as follows:

Art. III, Sec. 51: "The Legislature shall have no power to make any grant or authorize the making of any grant of public money to any individual, association of individuals, municipal or other corporations whatsoever. . ."

Art. III, Sec. 52: "The Legislature shall have no power to authorize any county, city, town or other political corporation or subdivision of the State to lend its credit or to grant public money or thing of value in aid of, or to any individual, association or corporation whatsoever. . ."

Art. VIII, Sec. 3: "Taxes shall be levied and collected by general laws and for public purposes only."

It must be conclusively presumed, of course, that the Legislature was familiar with the provisions of the Federal Act and that therefore it intended to authorize the State Agency to enter into such agreements with the Federal Security Administrator as are contemplated by the Federal Act. We will next consider whether the Legislature may validly authorize a State agency to enter into the type of agreement required by the Federal Act in order to obtain coverage for the officers and employees of the counties and of municipalities of the State other than employees engaged in performing services in connection with a proprietary function.

Section 50 of Article III of the Constitution of the State of Texas reads, in part, as follows:

> "The Legislature shall have no power to give or to lend, or to authorize the giving or lending, of the credit of the State in aid of, or to any person, association or corporation, whether municipal or other, or to pledge the credit of the State in any manner whatsoever, for the payment of the liabilities, present or prospective, of any individual, association of individuals, municipal or other corporation whatsoever."

If the agreement required by the Federal Act and authorized by House Bill 603 amounts to a lending of the State's credit to the counties or municipalities whose officers and employees will obtain coverage, the Act would be invalid. A limitation on the power of the Legislature to lend or give the state's credit does not apply to a loan or gift of the state's credit for state purposes. 59 C.J. 208, States, Sec. 346. In construing the prohibition contained in Section 50 of Article III, the Supreme Court in City of Aransas Pass v. Keeling, 112 Tex. 339, 247 S.W. 818, 820 (1923), made the following statement:

> "To the extent that the State aids in protecting Aransas Pass from the menace of storms through a grant of part of the State taxes, she discharges a State obligation, and hence no question arises as to lending or pledging the State's credit to a municipal corporation or for payment of the liabilities of such a corporation." (Emphasis added.)

We are of the opinion that to the extent the State aids its counties in obtaining coverage agreements for their officers and employees under the Federal Act, it is likewise discharging a State obligation and that therefore no question can arise as to the lending or pledging of the State's credit in their behalf. The

decisions in this State are uniform in their recognition of counties as agencies of the State through which the State discharges the duties which the State as an organized government assumes to every person and by which it can best promote the welfare of all. City of Galveston v. Posnainsky, 62 Tex. 118 (1884). The functions of county officers and employees are so tied in with State government as to be essential to its proper functioning; and the State, therefore, has a very vital interest in the efficient functioning of county government. It is obviously in the best interest of the State to attract to, and retain in the service of, the counties the highest type of officers and employees. That there is an inducement to enter and remain in the services of an employer who provides some form of retirement or pension plan is so well recognized as to require no elaboration. Thus, providing some such plan is of vital concern not only to the county but also to the State as a whole. The proper method for making such provision, the particular plan, is a matter which properly lies within the discretion of the Legislature. This discretion the Legislature has exercised, and the coverage agreements for county officers and employees, as authorized by House Bill 603, do not constitute a lending of the State's credit within the meaning of the constitutional prohibition.

This construction of Section 50 of Article III is consistent with the construction which has been placed upon Section 51 of Article III by those decisions which recognize that the prohibition against legislative grants of public money to any individual, association of individuals, municipal or other corporations does not prohibit an appropriation of State funds to counties to be used by them in carrying out a part of the duties or governmental functions which properly rest on the State. Jefferson County v. Board of County and District Road Indebtedness, 143 Tex. 99, 182 S.W. 2d 908 (1944). A contrary interpretation of Section 50 of Article III would do violence to the well established principle that the Constitution must be construed as a whole so as to give effect to all its provisions, and, if possible, to harmonize them. Texas Nat. Guard Armory Board v. McCraw, 132 Tex. 613, 126 S.W.2d 627, 634 (1939), and authorities cited therein.

We will next consider whether agreements entered into by the State to obtain coverage for employees of municipalities, other than those engaged in performing services in connection with a proprietary function, would constitute a lending of the State's credit in violation of the prohibition of Section 50 of Article III.

Although municipal corporations have been said to be created primarily to regulate the internal concerns of the inhabitants of a defined locality in matters peculiar to the place incorporated, Bexar County v. Linden, 110 Tex. 339, 220 S.W.2d 61 (1920),

nevertheless they"have a two-fold character, one governmental and the other private, and, in so far as their character is governmental, they are agencies of the state, and subject to state control." Yett v. Cook, 115 Tex. 205, 281 S.W. 837 (1926), and authorities cited therein; 1 Cooley, Constitutional Limitations (8th Ed. 1927) 43. In Texas Nat. Guard Armory Board v. McCraw, supra, the court said:

> "The State has a vital interest in its cities. In its governmental capacity a city is a political subdivision of the State, and in many instances is considered as an agent of the State; and the State may use such agent in the discharge of its duties."

The agreements authorized by House Bill 603 would obtain coverage only for such employees of municipalities as are engaged in governmental functions as distinguished from proprietary functions. We think that the State's interest in the efficient discharge of city government is equally as great as its interest in the efficient discharge and functioning of county government. The whole is no better than the sum of its parts, and we think that the public benefit to be derived from the maintenance of the highest type of local government clearly imposes a duty and an obligation upon the State to aid in obtaining such government. The reasoning which justifies the assumption of an obligation on the part of the State to aid the counties in the efficient discharge of county functions justifies a State obligation which will enable municipalities to efficiently perform their governmental functions. The inhibition of Section 50 of Article III was never intended to prevent the State from lending its credit for proper purposes. If the State cannot use its credit for governmental purposes, a situation might well arise in which it could not function. Article III, Section 50 and its related provisions in the Constitution of Texas which were enacted for the purpose of protecting public funds were never intended to apply to such legitimate use of the State's credit. Rather, their purpose and those of similar constitutional provisions enacted by other states in the Union were to put an end to the use of the credit of the State in fostering private business, a practice which prevailed in the early days of the history of most states.

The Supreme Court of Iowa, in construing the Iowa constitutional provision that "The credit of a state shall not in any manner, be given or loaned to, or in aid of, any individual, association, or corporation" stated that the provision was the result of the past experience of states in loaning their credit freely and extravagantly to corporate enterprises such as railways, canals, waterpowers, etc., and that it was for the purpose of inhibiting the incurring of obligations by the indirect method of secondary liability that the constitutional provision was enacted. Grout v.

Kendall, 192 N.W. 529, 195 Iowa 467 (1923). See also the dissenting opinion by Judge Cardozo in People v. Westchester Nat. Bank, 231 N.Y. 465, 132 N.E. 241 (1921).

Had we any doubt as to the constitutionality of the provisions of House Bill 603 which we are presently discussing, the well settled rule that all doubts must be resolved in favor of constitutionality would require us to sustain these provisions. Brown v. City of Galveston, 97 Tex. 1, 75 S.W. 488 (1903); Greene v. Robison, 117 Tex. 516, 8 S.W.2d 655 (1928); Duncan v. Gabler, 147 Tex. 229, 215 S.W.2d 155 (1948); 9 Tex. Jur. 479, Constitutional Law, Sec. 60; 1 Cooley, Constitutional Limitations (8th Ed. 1927) 354, 355, 375.

Having concluded that the agreements authorized by House Bill 603 do not constitute a lending of the credit of the State, we pass to a consideration of whether any provision of the Texas Constitution will be violated by a compliance with the requirement of Section 218(g) of the Federal Act that agreements entered into between the states and the Administrator shall be binding for at least a five-year period.

The State's right to contract is unlimited except by the Constitution. As stated by the Supreme Court in Texas Nat. Guard Armory Board v. McCraw, supra:

> "The subjects of contract, the length of term for which a contract may be made, and the general policy relating to contracts, are clearly within the power of the Legislature. The Constitution does not provide for the length of term for which a contract may be made by the State. The only provisions of the Constitution which might affect the term of a contract are those which prohibit the creation of any debt by or on behalf of the State (Section 49 of Article 3 of the Constitution) and that no appropriation of money may be made for a longer term than two years (Section 6 of Article 8 of the Constitution), and that monopolies shall never be allowed (Section 26 of Article 1 of the Constitution)."

Under the provisions of House Bill 603 it is clear that no debt is created by or on behalf of the State; nor is any appropriation of money for longer than a two-year period attempted. We are therefore of the opinion that the legislative authorization to comply with the requirements of Section 218(g) is constitutional.

The trust funds which are established by Section 12 of House Bill 603 are similar to the trust fund which was considered and upheld in the Friedman case, supra, in the face of the conten-

tion that the requirements of Section 6 of Article VIII of the State Constitution had not been met.[2] The requisites of this provision are therefore satisfied.

We have discussed only those provisions of the Constitution which raise some serious question as to the validity of the provisions of House Bill 603. We have not mentioned or discussed those provisions of the Constitution which are not involved or which are clearly satisfied. Likewise, we have not discussed any provisions of the Federal Constitution since none of its provisions cast any doubt upon the validity of this legislation. Our conclusion is that the Act is valid, and you are accordingly so advised.

## SUMMARY

The provisions of House Bill 603 which authorize the State to enter into agreements with the Federal Government for the purpose of extending Federal old-age and survivors insurance coverage to employees of counties and municipalities of the State other than employees engaged in performing services in connection with a proprietary function do not constitute a lending of the State's credit within the meaning of Section 50 of Article III, Constitution of Texas. The authorization to governing bodies of counties and municipalities to pay contributions in the amount required by the Federal Act from the funds from which covered employees receive their compensation is not obnoxious to Sections 51 and 52 of Article III, or to Section 3 of Article VIII, since employees' right to receive coverage benefits will be a part of the agreed compensation paid for services rendered. Byrd v. City of Dallas, 118 Tex. 28, 6 S.W.2d 738 (1928); Friedman v. American Surety Co. of New York, 137 Tex. 149, 151 S.W.2d 570 (1941). The State may enter into a coverage agreement for the minimum five-year term, since the only constitutional provisions (Sec. 49, Art. III; Sec. 6, Art. VIII; Sec. 26,

---

[2] Section 6 of Article VIII reads, in part, as follows:

"No money shall be drawn from the Treasury but in pursuance of specific appropriations made by law; nor shall any appropriation of money be made for a longer term than two years. . ."

Art. I, Tex. Const.) which may affect the term of a
State contract have not been violated. See Texas Nat.
Guard Armory Board v. McCraw, 123 Tex. 613, 126
S.W.2d 627 (1939). The provisions of House Bill 603
which create and provide for the administration of the
Social Security Fund and the Social Security Adminis-
tration Fund do not violate Section 6 of Article VIII of
the Constitution. Friedman v. American Surety Co.
of New York, supra. House Bill 603 is constitutional.

Yours very truly,

PRICE DANIEL,
Attorney General

APPROVED:

By Marietta McGregor Creel
Mrs. Marietta McGregor Creel
Assistant

W. V. Geppert
Taxation Division

Jesse P. Luton, Jr.
Reviewing Assistant

Charles D. Mathews
First Assistant

MMC/mwb