## DAYTON–GOOSE CREEK RY. CO. v. UNITED STATES et al.

(District Court, E. D. Texas, at Beaumont.   March 16, 1923.)

No. 262.

1. **Constitutional law ⬅48—Unconstitutionality not declared, unless free from reasonable doubt.**

An act of Congress will not be declared unconstitutional, unless the question is free from any reasonable doubt.

2. **Constitutional law ⬅297—Eminent domain ⬅2(8)—Requirement that part of excess railroad earnings be paid to Interstate Commerce Commission not denial of due process of law, nor taking of property without compensation.**

Under Const. art. 1, § 8, cl. 7, authorizing Congress to establish post offices and post roads, and Rev. St. § 3964 (Comp. St. § 7456), declaring all railroads to be post roads, the provision of Transportation Act 1920, § 422, requiring all railroads having net earnings in excess of 6 per cent. to hold one-half of such excess as trustee for the United States, and to pay the same over to the Interstate Commerce Commission, to constitute a revolving fund, to be used in the furtherance of the public interest in railway transportation, is not unconstitutional, as depriving such railroad of its property without compensation and denying due process of law.

3. **Commerce ⬅3—Congress may resort to taxation to promote interstate commerce; "regulate interstate commerce."**

The power of Congress to regulate interstate and foreign commerce includes the power to adopt measures to aid and encourage such commerce, and in promoting these objects the power of taxation may properly be exercised.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Regulate Commerce.]

4. **Commerce ⬅3—Congress may impose tax in furtherance of interstate commerce.**

The provision of Transportation Act 1920, § 422, requiring railroads to pay to the Interstate Commerce Commission's revolving fund one-half of all net earnings in excess of 6 per cent. for the promotion of the public interest in railway transportation, is within the power of Congress as a legitimate tax imposed on all railroads to further interstate commerce.

5. **Carriers ⬅23—Statutory requirement that railroads pay proportion of excess revenues to Interstate Commerce Commission revolving fund valid.**

The provision of Transportation Act, 1920, § 422, requiring railroads to pay one-half of annual net earnings in excess of 6 per cent. to Interstate Commerce Commission, is not objectionable on the ground that no allowance is made for claims accruing, but unliquidated, during each income period.

6. **Constitutional law ⬅42—Carrier not entitled to excess earnings cannot question validity of act disposing of fund.**

A carrier, earning and collecting net earnings in excess of 6 per cent. on the valuation of its properties having no right, under Transportation Act 1920, § 422, to retain the excess, cannot question the constitutionality of those provisions of the act regulating and prescribing the use of such excess income.

7. **Commerce ⬅3—Requirement of Transportation Act regulating use of excess earnings within power of Congress.**

The requirement of Transportation Act 1920, § 422, that railroads shall place one-half of their net earnings in excess of 6 per cent. in a reserve fund, to be used for certain purposes, is within the power of Congress in regulating interstate commerce.

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Equity. Bill by the Dayton-Goose Creek Railway Company against the United States and others for injunction to restrain the Interstate Commerce Commission from enforcing provisions of Transportation Act 1920. On complainant's motion for preliminary injunction, and defendants' motion to dismiss. Injunction denied, and bill dismissed.

John C. Townes, Jr., Frank Andrews, Robert H. Kelley, and Andrews, Streetman, Logue & Mobley, all of Houston, Tex., for complainant.

Blackburn Esterline, Asst. Sol. Gen., of Washington, D. C., Randolph Bryant, U. S. Atty., of Sherman, Tex., and S. D. Bennett, Asst. U. S. Atty., of Beaumont, Tex., for defendants.

Before WALKER, and KING, Circuit Judges, and FOSTER, District Judge.

PER CURIAM. Dayton-Goose Creek Railway Company, a corporation organized and existing under the laws of Texas, filed its bill in equity against the United States of America, the Interstate Commerce Commission (herein called the Commission), and the United States District Attorney for the Eastern District of Texas, the district in which complainant has its principal office and principal operating office. The bill contained allegations to the following effect:

Complainant is now, and has been since a date long prior to the 29th day of February, 1920, a common carrier by railroad, engaged in the transportation of freight and passengers, for hire, in intrastate, interstate, and foreign commerce, and as such is now, and was at all times mentioned in the bill, subject to the act of Congress entitled "An act to regulate commerce, and for other purposes," approved February 4, 1887, and acts amendatory thereof and supplementary thereto, and also subject to the lawful provisions of the Transportation Act of 1920, and to all other lawful acts of Congress regulating railroads engaged in interstate and foreign commerce. Pursuant to orders of the Commission, complainant, under protest, has filed a report containing a statement of investment in road and equipment, of net railway operating income, by months, for the year ended December 31, 1920, and of excess railway operating income for the 10 months of that year from March 1, 1920, to December 31, 1920. It filed a similar report covering the entire year 1921. Each of those reports showed that, for the period it covered, complainant had a net railway operating income in excess of 6 per cent. of the value of the railway property held for and used by it in the service of transportation, and stated the amount of such excess. The Commission has, by orders set out, required one-half of such excess to be placed by complainant in a reserve fund, and demanded of the complainant payment by it of one-half of such excess, and has fixed a stated date by which such demand is to be complied with. If such demands are not complied with within the time fixed, the Commission will undertake to prosecute complainant, its officers and directors, and to subject them to fines and penalties for failing to comply therewith. The bill contains a prayer for a temporary injunction staying and suspending said orders

of the Commission, so far as they relate to the payment of money by complainant to the Commission and into a reserve fund of complainant.

The case was submitted on complainant's application for a temporary injunction and on motion of the United States to dismiss the bill. The Transportation Act of 1920 was passed by the Congress to accomplish a number of purposes. The railroads of the country for more than two years had been taken out of the hands of their owners and operated by the federal government, as a single system. This operation had ignored the competitive system formerly existing between lines of railway, and had routed the business solely with a view to its expeditious handling to meet the emergencies arising from a state of war. Business which, under the former system, would have been solicited and moved over certain lines, was under government control frequently routed over a formerly competitive line.

The government was, on March 1, 1920, restoring the operation of the railroads to their owners, to re-establish their several businesses and resume their relations as carriers, by land, of the commerce of the country. In so doing, it recognized that the years of government operation had altered the practical relation of the railroads to the public and to governmental regulations. The Congress determined that its powers to regulate interstate commerce must now be exercised to a wider extent than before, in order that an adequate system of interstate transportation should be preserved for the commerce of the country. To that end it greatly enlarged the powers of the Interstate Commerce Commission. It empowered it to group the railroads of the country, to prescribe rates adequate to a fair remuneration of each of the members of such groups, and to order proper divisions of such joint rates. It could also prescribe minimum as well as maximum rates. It could exercise such control over intrastate rates as would prevent discriminations against interstate or foreign commerce. It could control the issuance of railroad securities, the building of additional roads, and the abandonment of existing lines, so far as they were interstate carriers. It could plan and recommend the consolidation of all the railroads of the country into a number of interstate systems, not being necessarily restrained by existing competition.

The scope of this act and the departure therein from the former limitations on the regulation of interstate commerce have been the subject of recent consideration by the Supreme Court of the United States in the case of Akron, Canton & Youngstown Railway Co. et al. y. United States et al. (the New England Divisions Case) 43 Sup. Ct. 270, 67 L. Ed. ——, opinion rendered February 19, 1923. In this opinion it is said:

"Transportation Act 1920 introduced into the federal legislation a new railroad policy. Railroad Commission of Wisconsin v. Chicago, Burlington & Quincy R. R. Co., 257 U. S. 563, 585. Theretofore the effort of Congress had been directed mainly to the prevention of abuses; particularly those arising from excessive or discriminatory rates. The 1920 act sought to insure, also, adequate transportation service. That such was its purpose Congress did not leave to inference. The new purpose was expressed in unequivocal language, and, to attain it, new rights, new obligations, new machinery, were created. The new provisions took a wide range. Prominent among them are those

specially designed to secure a fair return on capital devoted to the transportation service. Upon the Commission, new powers were conferred, and new duties were imposed. The credit of the carriers, as a whole, had been seriously impaired. To preserve for the nation substantially the whole transportation system was deemed important. By many railroads funds were needed, not only for improvement and expansion of facilities, but for adequate maintenance. On some, continued operation would be impossible, unless additional revenues were procured. A general rate increase alone would not meet the situation. There was a limit to what the traffic would bear. A 5 per cent. increase had been granted in 1914 (the Five Per Cent. Case, 31 I. C. C. 351; 32 I. C. C. 325), 15 per cent. in 1917 (the Fifteen Per Cent. Case, 45 I. C. C. 303), 25 per cent. in 1918 (General Order of Director General, No. 28). Moreover, it was not clear that the people would tolerate greatly increased rates (although no higher than necessary to produce the required revenues of weak lines) if thereby prosperous competitors earned an unreasonably large return upon the value of their properties. The existence of the varying needs of the several lines and of their widely varying earning power was fully realized."

Among other provisions the act provided substantially that all railroads should hold one-half of the excess of net earnings over 6 per cent. net on the valuation of its property as fixed by the Commission after paying expenses, as trustee for, and pay the same to, the United States. These sums were to be collected by the Interstate Commerce Commission and used by it "in furtherance of the public interest in railway transportation, either by making loans to carriers to meet expenditures for capital account or to refund maturing securities originally used for capital account, or by purchasing transportation equipment and facilities and leasing the same to carriers"; sums so collected and accretions thereof to constitute a revolving fund to be used for the purposes stated. Transportation Act 1920, § 422, 41 Stat. 456, 488.

[1, 2] This provision is attacked as unconstitutional, on the ground that it takes the property of the carrier from whom such per cent. of excess earning is collected without compensation, and denies to it due process of law, and also on the ground that the requirement, so far as it embraced any earning from intrastate rates, was beyond the power of Congress. It is well settled that no act of Congress will be declared unconstitutional unless the question is free from any reasonable doubt. Nicol v. Ames, 173 U. S. 509, 515, 19 Sup. Ct. 522, 43 L. Ed. 786.

It would not be seriously questioned that in returning the railroads to their owners, after their use during the World War, the United States could have made an appropriation creating a revolving fund, and prescribed for its use in aiding railroads as is now provided in the Transportation Act of 1920. It would be a reasonable exercise of its right to thus partly compensate for the use of their property, used in the manner above recited, during the period of government operation.

Furthermore, by the Act of June 8, 1872, all of the railroads of the country are declared to be post roads. Rev. St. § 3964 (U. S. Comp. St. § 7456). By the Constitution the Congress is expressly empowered "to establish post offices and post roads." Const. art. 1, § 8, cl. 7. Under this and other like powers the Congress has aided the construction of the transcontinental lines. These powers would authorize aid

to be extended in the manner prescribed in the Transportation Act to keep up and make efficient such railroads as needed the same.

[3, 4] The only question left, therefore, is as to the government's right to raise this fund, so to be used, by requiring the railroads to pay to it one-half of the excess earned by them over certain percentages. It will be noted that no road earning any excess is relieved from this assessment. The power of Congress to regulate interstate and foreign commerce includes power to adopt measures to aid and encourage such commerce. Gloucester Ferry Co. v. Pennsylvania, 114 U. S. 196, 204, 5 Sup. Ct. 826, 29 L. Ed. 158; Mobile County v. Kimball, 102 U. S. 691, 696, 26 L. Ed. 238. To promote those objects it may exercise its power of taxation. License Tax Cases, 5 Wall. 462, 470, 18 L. Ed. 497. It is not doubted that funds raised by legal taxes or exactions may be devoted to the purposes for which the revolving fund provided for is required to be used.

While the exaction in question is not denominated a tax, it is in effect an excise tax, levied on all carriers subject to the Transportation Act, payable from surplus earnings. In other words, the carriers are exempt from this tax who do not earn a certain per cent. on their invested capital, and all are exempt up to this percentage of net earnings. All whose earnings exceed that amount are required to pay the same percentage of the excess to provide a given fund. In speaking of the raising of revenues for weaker lines, the Supreme Court, in the New England Divisions Case, says:

"In other words, the additional revenues needed were raised partly by a direct, partly by an indirect, tax."

We see no reason why the United States cannot measure this tax by the excess of profit realized over a specified percentage. It is the nature of the demand, and not its name as given in the statute, which determines if it is in truth a tax. Helwig v. United States, 188 U. S. 605, 613, 23 Sup. Ct. 427, 47 L. Ed. 614; Fontenot v. Accardo (C. C. A.) 278 Fed. 871, 874.

That this levy is made on excess profits derived from intrastate as well as from interstate traffic is not a sound objection. Regarded as a tax levied by the government, it can be measured by the entire profit of the railway, as well as by a percentage on that part of the surplus net income derived from interstate business. Where a tax is lawfully imposed upon the exercise of privileges within the taxing power of the nation, the measure of the tax may be the income from the property or business of the party taxed, although a part of such income is derived from property or business in itself not taxable by the nation. Flint v. Stone Tracy Co., 220 U. S. 108, 163, 31 Sup. Ct. 342, 55 L. Ed. 389, Ann. Cas. 1912B, 1312.

The tax would be an excise tax on the business of the class of carriers named. Railroad Co. v. Collector, 100 U. S. 595, 598, 25 L. Ed. 647. So regarded, the requirement that this fund be held in trust for, and be paid to, the United States, is, as to the percentage of sums collected in excess of the percentage to be retained by the railway company, not the taking of its property without compensation or due process of law. Indeed, this part of the income of the road is not collected

by it absolutely as its property. It is earned and collected under the terms of the Transportation Act, to be held in trust for, and to be paid to, the United States.

It is not contended that the part of its net revenue from its railway operations, which, under the provision in question, complainant is permitted to retain, is less than a fair and remunerative return on its investment in road and equipment. So far as complainant is concerned, the practical result is the same as it would have been if the rates and charges for complainant's transportation services had been so fixed as to enable it to receive for such services a compensation no greater than the amount it is permitted to retain after deducting the sums required by the Transportation Act.

[5] But it is insisted that this provision leaves open the question that shippers may bring suits against a carrier, who makes a large income under the rates permitted, for overcharges, and that the carrier will have then disposed of this part of the overcharge to the government. In effect, the suggestion is that the returns made in the manner prescribed do not show complainant's real net railway operating income for the periods covered, as deductions to be made from gross income do not include amounts which, after the dates of the returns, complainant may be required to pay in discharging claims which accrued during such periods, which amounts may be unascertainable until afterwards.

We do not understand that the validity of a tax or exaction based upon yearly income, or an excess thereof over a stated per cent., is dependent upon it being permissible, in ascertaining such income or such excess, to deduct from the amount of gross income received during the year both what is paid during the year in discharging liabilities previously incurred and also an amount to cover liabilities incurred during the year which remain unliquidated at the end of the year and when the return is made. Where the right to claim an overcharge exists, the repayment of such overcharge would be a charge against the gross income of the year when paid, as an expense of that year, just as payments made in the year 1922 on judgments rendered against a carrier are reckoned as an expense of that year notwithstanding the claim originated in an earlier year. It is not sufficiently probable that there will be such differences in the income of succeeding years as to make it likely that this method of dealing with this subject would not average itself. What are proper deductions to be made from gross income in ascertaining net income for a given period is a matter for legislative determination.

It may well be questioned whether a claim for overcharge would be sustained where a rate approved by the Commission was charged. The carriers are not required to charge these rates; they are only permitted so to do, and it hardly lies in the mouth of a carrier to suggest that the rates so charged by it will be considered unreasonable, where fixed by it within a maximum allowed by the Commission, especially where the excess over a limited per cent. is paid to the government under a statute so requiring or appropriated in the manner prescribed by the Transportation Act. It is to be presumed that the rates permitted to be charged by the railroads under this act are not unjust and unreasonable as to the shippers, where authorized by the Commission, which is

vested with such extensive powers as to seeing that such rates are just and reasonable and nondiscriminatory as to the shippers.

It may be also questioned whether the carrier could be charged, in any event, with the percentage which had been paid therefrom to the United States under the terms of this act. But if the sums paid to the government are to be regarded as overcharges paid by shippers, and as money to which they are entitled, this does not give to the carrier any right to retain this sum, or to an injunction to restrain the government from collecting the sum which the carrier is only allowed to collect as a trustee for the United States, or for special purposes prescribed by statute.

The Transportation Act provides that this fifty per cent. of the excess over 6 per cent. is not collected, or held, by the carrier for its own account, but as trustee for the United States, to whom it is to be paid. Clearly the carrier is not entitled to retain it, in the absence of any demand on it for its repayment by the persons from whom collected. The utmost of its right, in that event, would be to interplead the claimants. It would have no right to retain the fund as its own, which it now proposes to do. It does not concede any liability to refund this or any other fund to the shipper.

[6] If the carrier has no right to the fund, it cannot raise the question of the constitutionality of this part of the Transportation Act. Hatch v. Reardon, 204 U. S. 152, 160, 27 Sup. Ct. 188, 51 L. Ed. 415, 9 Ann. Cas. 736; Turpin v. Lemon, 187 U. S. 51, 60, 23 Sup. Ct. 20, 47 L. Ed. 70.

[7] As to the requirement that the rail carriers subject to the Transportation Act shall devote the remaining 50 per cent. excess over said 6 per cent. to certain purposes, this does not take away any part of said fund from the carrier earning it. It only requires the carrier to hold and use it for certain of its corporate purposes. We think that this is within the powers of the Congress to order. Wilson v. New, Receiver, 243 U. S. 332, 347, 37 Sup. Ct. 298, 61 L. Ed. 755, L. R. A. 1917E, 938, Ann. Cas. 1918A, 1024.

It is not perceived what right the complainant has, in this situation, to decline to recognize its liability to the United States, and make payment to the Interstate Commerce Commission, as its designated agent.

The injunction applied for will be denied, and the bill dismissed.