

# THE ATTORNEY GENERAL

## OF TEXAS

### AUSTIN 11, TEXAS

**WILL WILSON**
**ATTORNEY GENERAL**

April 2, 1959

Honorable Truett Latimer
Chairman
Agriculture Committee
House of Representatives
Austin, Texas

Opinion No. WW-584

Re: Constitutionality of H.B.
174, 56th Leg., relating
to producers of peanuts
acting jointly with the
Commissioner of Agricul-
ture in promoting the
production and use of
peanuts,

Dear Sir:

      In your recent letter you have advised us that
the House Agriculture Committee, 56th Legislature, has
referred House Bill 174 to this office for an opinion re-
garding its constitutionality.

      House Bill 174 authorizes the Commissioner of
Agriculture to certify an association recommended by the
Southwestern Peanut Growers Association to conduct a State-
wide referendum among commercial producers of peanuts. An
annual assessment of One Dollar ($1) per net ton of peanuts
marketed by such producers is to be levied against such pro-
ducers, if as many as two-thirds (2/3) of those voting in
such referendum favor the levy.

      The annual assessment is to be continued until at
least ten per cent (10%) of the members of the association
call for another referendum, and at such subsequent referen-
dum a certain percentage vote to discontinue the assessment.

      We note here that the bill is not clear on the
matter of what circumstances are required in order to dis-
continue the assessments, the last sentence of Section 12
in the proposed legislation providing as follows:

> " . . . If such a partition '/sic/' is
> presented to the said board, then the board
> shall conduct a subsequent referendum in the
> same manner as outlined above and future as-
> sessments <u>will be made only two-thirds or</u>

more of the producers eligible to participate
in such referendum and voting therein shall
vote in the affirmative." (Emphasis ours.)

We assume that the error is typographical and
will be corrected before final enactment of the legislation.

House Bill 174 provides that the Commissioner of
Agriculture shall upon request of the certified association
following a vote in the referendum favoring the assessment
notify all purchasers of the product that on and after a cer-
tain date the assessments shall be deducted by the purchaser
or his agent from the purchase price of such product. The
assessment so deducted is to be remitted by the purchaser to
the Commissioner on or before the 20th day of the month fol-
lowing such deduction. The Commissioner of Agriculture is
to pay ninety-five per cent (95%) of the assessments to the
certified association or organization by the end of the month.

Inspection of the purchaser's books and records
by the Commissioner is authorized by the bill. On all sums
so remitted to the Commissioner he is entitled to deduct
five per cent (5%) for administration of the act. These
amounts deducted by the Commissioner are to be paid into the
State Treasury and are by the act appropriated for the use
of the Commissioner in carrying out the provisions of the
act.

With the exception of the five per cent (5%) noted
above, the bill does not authorize the deposit of the assess-
ments in the State Treasury, but provides only that they
shall be received by the Commissioner of Agriculture and
by him remitted to the certified association or organization.

Under the bill any producer who is dissatisfied
with the assessment may demand and receive from the treas-
urer of said association a refund if the demand is made in
writing within thirty (30) days from the date on which the
assessment is collected from the producer.

The proposed statute indicates that the portion
of the assessments in excess of the five per cent (5%) to
be deducted by the Commissioner is to be used for the pur-
pose of financing or contributing toward the financing of

a program of research, education and promotion designed to increase the production, consumption and quality of Texas grown peanuts.

Does the exaction authorized by House Bill 174 constitute a tax?

A tax is not a voluntary payment or donation, but an enforced contribution. 84 C.J.S. 32, Taxation, Sec. 1. Although the peanut producer who is dissatisfied with an annual assessment is authorized by House Bill 174 to demand the return of his money, the fact remains that he has been made by law to part with it involuntarily in the first instance. Under this bill money may be taken, for a time at least, without the consent of as many as one-third (1/3) of the class subject to the exaction. The farmer is deprived of the use of his money, but no provision is made to pay him interest. Further, he is put to the trouble of having to make written demand for the return of his money, and no provision is made as to when the money must be returned to him following demand. The fact that the farmer's money has been taken without his consent and diverted to other uses for a time is not explained away by saying the condition may only be temporary.

The revenue derived from the exation authorized by House Bill 174 does not enter the State Treasury. But the case of Friedman v. American Surety Co. of New York, 137 Tex. 149, 151 S.W.2d 570 (1941) indicates that circulation through the State Treasury is not a prerequisite of a tax. In that case it was held that the "contributions" required by the Unemployment Act to be made by employers to provide compensation for certain employees during involuntary unemployment are taxes, and that the statute is a tax statute, even though the fund into which such contributions are made never becomes a "State fund," that is, paid into the State Treasury, but only a fund in the custody or trust of the State Treasurer. In the words of the Court:

> " . . . The taxes are levied and collected for such fund, and not for the State in its sovereign capacity. . . ."

Under House Bill 174 money is to be collected from a certain class for a particular fund. It is not

collected for the general use of the State and does not come into the State Treasury. It comes within the custody of a State officer to be expended for the primary benefit of a certain class. In these respects the "assessments" provided for in House Bill 174 are like the "contributions" held to be a tax in the Friedman case, supra.

The question of whether a particular charge or burden is a tax depends on its real nature, and if in its nature it is a tax, it makes no difference that it be otherwise labeled in the statute imposing such burden. County of Harris v. Shepperd, 156 Tex. 18, 291 S.W.2d 721 (1956); 84 C.J.S. 34, Taxation, Sec. 1.

In Texas Jurisprudence a tax is described in the following terms:

> "Broadly speaking, 'tax' embraces every levy made by the government (or any subdivision thereof) for public uses. But in a narrower sense, the term connotes a charge imposed in aid of revenue, . . ." 40 Tex.Jur. 11, Taxation, Sec. 2.

That the exaction of money authorized by House Bill 174 from producers of peanuts is a levy made by the government for what are ostensibly public uses is self-evident. The exaction is plainly a charge imposed in aid of revenue, as is seen from the case of H. Rouw Co. v. Texas Citrus Commission, 151 Tex. 182, 247 S.W.2d 231 (1952), which is hereinafter considered in detail.

If the revenue derived from the charge is not for a public or governmental purpose then the Legislature has no authority to authorize the levy, the bill thereby becoming unconstitutional on that ground alone. Fourteenth Amendment, U.S. Const.; Tex. Const. Art. VIII, Sec. 3. For present purposes only we assume that the exaction is for a "public purpose" within the meaning of the foregoing constitutional provisions.

Under the instant bill producers of peanuts supposedly benefit from the money deducted from the sale of their crop, but the public in general is also benefited and, hence the benefits are merged. Any payment exacted at the instance of the State as a contribution toward maintaining

governmental functions is a tax rather than an assessment, if the special benefits derived by those who pay the charge are merged in general benefit. Dickson v. Jefferson County Board of Education, 311 Ky. 781, 225 S.W.2d 672 (1949); State ex rel Fargo v. Wetz, 40 N.D. 299, 168 N.W. 835 (1918); 5 A.L.R. 731; 51 Am. Jur. 38, Taxation, Sec. 4.

True assessments are levied with reference to special benefit which the property is supposed to receive from the charge. City of Wichita Falls v. Williams, 119 Tex. 163, 26 S.W.2d 910 (1930). But if the exaction is levied upon all within the class in proportion to the value of the thing taxed, such charge is ordinarily held to be a tax and not an assessment. Wharton County Drainage District No. 1 v. Holmes, 149 S.W. 381 (Tex.Civ.App. 1912, error ref.)

Here the levy is against all within the class, the producers of peanuts for commercial purposes. The value derived by the various producers from research, education and promotion is practically incapable of estimation. The levy is not in proportion to the benefits to be derived from the charge as in the case of assessments.

A charge or a fee, if for the purpose of raising revenue, is a tax and levied under the taxing power. Harris County v. Shepperd, supra. The monies secured by the exaction made under House Bill 174 are to be used for research, education and promotion instead of regulation of the peanut industry. As is hereafter shown by the case of H. Rouw Co. v. Texas Citrus Commission, supra, an exaction for such purpose is regarded as a revenue measure. Being a revenue measure rather than a regulatory measure, it is a tax.

Present here are the essential characteristics of a tax. Money may be taken without the consent of the person paying the exaction. It is taken under the authority of legislative act. It is taken for revenue purposes. A State official receives and handles the revenue derived from the "assessment," using his State office and powers in an integral phase of the collection and disbursement of the revenue. This official is called upon to certify the agency that will conduct the referendum and expend the funds collected from peanut producers. He is empowered to inspect the books of those who collect the charge against producers. The funds collected are to be spent for the purposes designated in the bill. Clearly, the State lends its authority

and the aura of governmental power to the imposition of this burden and the expenditure of the revenue derived from the exaction.

What kind of tax is authorized by House Bill 174?

In H. Rouw Co. v. Texas Citrus Commission, supra, the Texas Supreme Court held that a tax authorized by the Texas Citrus Law (Art. 118d, V.T.C.S.) to be imposed by the Texas Citrus Commission on persons, firms, associations and corporations of not exceeding Three Cents (3¢) per standard box or bag on all citrus fruit grown in the State and packed or placed in containers and marketed or processed and sold during a certain time was an occupation tax. The charge was not designated as an occupation tax in the statute.

The Texas Citrus Law provided that the tax money was " . . . to be used . . . in education and research for the purpose of increasing knowledge with respect to Texas citrus fruits and by-products, and protecting Texas citrus fruits from pests and diseases and of finding new uses for Texas citrus fruits and by-products and of improving the quality and yield of such fruit and by-products." The test laid down by the Court and its application to the facts of that case were as follows:

> " . . . There has been much written upon the difference between a license tax, and an occupation tax. . . . This court, in very clear and compelling language, laid down the rule for determining the distinction in the case of Hurt v. Cooper, 130 Tex. 433, 110 S.W.2d 899, (1) as follows: 'It is sometimes difficult to determine whether a given statute should be classed as a regulatory measure or a tax measure. The principle of distinction generally recognized is that when, from a consideration of the statute as a whole, the primary purpose of the fees provided therein is the raising of revenue, then such fees are in fact occupation taxes, and this regardless of the name by which they are designated. On the other hand, if its primary purpose appears to be that of regulation, then the fees levied are license fees and not taxes. Hoefling v. City of San Antonio, 85 Tex. 228, 20 S.W. 85, 16 A.L.R. 608; Brown v. City of Galveston, 97 Tex. 1, 75 S.W. 488; City of Fort Worth v. Gulf Refining Co.,

125 Tex. 512, 83 S.W.2d 610; Royall v. Virginia, 116 U.S. 572, 577, 6 S.Ct. 510. 29 L. Ed. 735; Dayton-Goose Creek Ry. Co. v. United States, D. C., 287 F. 728; Texas Co. v. Brown, D. C., 266 F. 577, 37 C.J. p. 169, § 6.'

"Applying the above rule to the Act under consideration we find the tax levied to be an occupation tax. A reading of the Act clearly demonstrates that its primary purpose is to raise revenue, and not a regulation of the citrus fruit industry under the police power. Laudable as the purpose of the Act may be; viz: to advertise and enlarge the markets for Texas citrus fruit and its by-products, and for research beneficial to the citrus fruit industry, the primary purpose being the raising of revenues in excess of the amount needed for regulation of the industry to carry out the above provisions, under the well established rules of law, the tax levied must of necessity be classed as an occupation tax. . . ."

From the Rouw case, supra, it is seen that House Bill 174 is an occupation tax rather than a license tax because it authorizes the levy of a tax on growers for the primary purpose of raising revenue to stimulate the sale of peanuts instead of regulating the industry.

There can be no doubt that the tax provided by the bill is an occupation tax by reason of being a tax on the grower or activity of commercially producing peanuts rather than a property or sales tax. Like the tax in the Rouw case, supra, it is levied on persons based on certain occupational activity engaged in by them. The bill purports in its title to provide " . . . that producers may levy upon themselves assessments . . ." (Emphasis ours.) This language appears again in Sections 4, 7 and 21. Nowhere in the bill is it provided that the "assessment" is on peanuts; that is, the property. Nowhere in the bill is the "assessment" called a sales tax.

The tax is not an ad valorem tax in that it is not based on the value of the crop, but on the quantity sold.

The bill provides that the "assessment" shall be levied on the commercial producer and fixes the rate at One Dollar ($1) per net ton of farmer's stock peanuts

marketed.   The effect of the bill is to place a tax on the
commercial production of peanuts, the sale of the crop
being a necessary incident to such commercial production.
Louisiana State Department of Agriculture v. Sibille, 207
La. 877, 22 So. 2d 202 (1945).   Consequently, the levy of
an occupation tax is authorized by the bill.

Section 3 of Article VIII of the Constitution of
Texas provides in part as follows:

"Sec. 3.   One-fourth of the revenue
derived from the State occupation taxes . . .
shall be set apart annually for the benefit
of the public free schools; . . ."

House Bill 174 is, in our opinion, repugnant to
Section 3 of Article VII of the Texas Constitution by rea-
son of not setting apart annually one-fourth ($\frac{1}{4}$) of the
revenue derived from the occupation tax for the benefit of
the public free schools of Texas.   All of the revenue de-
rived from this occupation tax, except five per cent (5%)
which goes to the Commissioner of Agriculture, is by House
Bill 174 diverted to the certified association in violation
of the Texas Constitution.

Section 1 of Article VIII of the Constitution of
Texas provides in part as follows:

". . . persons engaged in mechanical and
agricultural pursuits shall never be required
to pay an occupation tax; . . ."

The Constitution of the State of Louisiana simi-
larly forbids the levying of license taxes on persons
engaged in agricultural pursuits.   La. Const. Art. X, Sec.
8.   The Supreme Court of that State in Louisiana State De-
partment of Agriculture v. Sibille, supra, struck down the
Louisiana statute imposing a tax on all sweet potatoes
shipped in Louisiana in so far as the tax violated the
aforesaid constitutional provision by imposing a tax on
the farmer shipping or carrying his crop to market.   The
Court stated:

"In the case of State v. Hayes, 143 La.
39, 78 So. 143, 144, which involved a provi-
sion of the 1913 Constitution identical with
that above quoted, it was stated:

'It has been decided by this court that
a farmer who goes from place to place selling
at retail the products of his farm is only
pursuing his farming business and is not a
peddler or hawker. He is engaged in an agri-
cultural pursuit, which is, by the terms of
article 229 of the Constitution, exempt from
any license tax. Roy v. Schuff, 51 La. Ann.
86, 24 So. 788.'

"The cited case of Roy v. Schuff concerned
Article 206 of the Constitution of 1879 which
exempted all persons engaged in agricultural
pursuits from the payment of a license tax. In
refusing to compel defendant to pay a municipal
license imposed on peddlers, the court said
/51 La. Ann. 86, 24 So. 789/:

'* * * He was only carrying out the purpose
he had in view in making the crop,--to sell it
at retail or wholesale, as deemed most advanta-
geous to him as a farmer. The selling was an
incident of farming, it may be said. It was a
part of his pursuit as a farmer, and he thereby
in no way became a peddler or a merchant. The
exemption covers both the farmer and the sale
by the farmer of that which his industry pro-
duces. . . .'"

The rationale of the above-cited Louisiana case is
persuasive on the issue now before us.

It is the farmer that is required to pay the tax
although it is not due until he sells his crop. How else
than by sale does the farmer utilize his agricultural pur-
suits? He cannot live on peanuts. The sale of the crop
is a vital and necessary element of and incident to the
occupation of farming. To hold that the producer of pea-
nuts is not engaged in agricultural pursuits when he harvests
the fruits of his labors from the sale of his crop would be
wholly unrealistic.

Inasmuch as the charge authorized by House Bill 174
is plainly an occupation tax and one which is to be levied
on persons engaged in agricultural pursuits; namely, the pro-
ducer of peanuts at the time he sells his crop, the proposed
legislation violates Section 1 of Article VIII of the Texas
Constitution.

In H. Rouw Co. v. Texas Citrus Commission, supra, it was held that Section 1 of Article VIII of the Texas Constitution was not contravened by a statute requiring the payment of a tax on citrus fruit by all who pack or place in containers and market or process and sell citrus fruits, the opinion of the Court on rehearing reading, in part, as follows:

"In its motion for rehearing appellee, for the first time, contends that even if the tax be held to be an occupation tax, it is valid within that part of Sec. 1 of Art. VIII of the State Constitution, which reads as follows: '* * * except that persons engaged in mechanical and agricultural pursuits shall never be required to pay an occupation tax; * * *.' The present tax is not a tax levied upon persons engaged in 'agricultural pursuits' within the meaning of the above quoted phrase from the Constitution. As is said in the amicus curiae brief supporting appellee's position 'the tax is levied upon the activity of packing or placing in containers and marketing or processing and selling citrus fruit grown in Texas. . . . The tax is exacted of any person, engaged in any vocation whatever, who performs these acts, whether he be commercial packer, gift fruit shipper, canner of citrus or bottler of lemon juice, processor of frozen orange juices, marmalade manufacturer, or whatever.'"

In contradistinction to the Texas Citrus Law under consideration in the Rouw case, supra, the instant bill taxes only "persons engaged in the production of peanuts in the State of Texas". It does not tax all who engage in the activity of selling peanuts, but only the producer who sells his own peanuts. The tax is not paid until the time of sale, but it is paid by the producer then and by no other person. It does not tax "any person engaged in any vocation whatever who performs the acts", but only the farmer, and thereby, in our opinion, places an occupation tax on persons engaged in "agricultural pursuits" within the purview of the constitutional provision prohibiting such taxes.

We examine now the effect which the invalidity of the tax provided by House Bill 174 will have on the remainder of the bill. Consideration will be given by the

Honorable Truett Latimer, page 11 (WW-584)


courts to a legislative declaration to the effect that an adjudication of the invalidity of a portion of the act should not affect any other portion.  39 Tex.Jur. 24, Statutes,Sec. 9.  House Bill 174 contains such a declaration in its "severability clause".

Nevertheless, when the invalid portions of an act are an integral and necessary part of the act, so as to preclude a separation leaving a complete, workable and other-wise valid law capable of being executed in accordance with legislative intent the entire act must fall.  Empire Gas and Fuel Co. v. State, 121 Tex. 138, 47 S.W. 2d 265 (1932); Taylor v. Taylor Bedding Mfg. Co., 245 S.W. 2d 215 (Tex.Civ. App. 1948, reh.den., error ref.); Young v. State, 267 S.W. 2d 423 (Tex.Crim.App. 1954); 39 Tex.Jur. 22, Statutes, Sec. 9.

Without the portion of the act authorizing the levy of an "assessment" on producers of peanuts, the main purpose of House Bill 174 is defeated, it being apparent that the design of the bill is to raise revenue to finance promotion of the sale of Texas peanuts.  The provisions for "assessment" are so intimately connected with the remainder of the bill that they are inseparable.  The portion of the bill left after taking away the invalid part is plainly incomplete and unworkable.  Here the invalidity of a part permeates the whole, and we must advise you that the entire bill would fol-low the fate of the unconstitutional provisions authorizing the levy of a tax.

As the question of constitutionality posed by your letter is resolved on the above grounds, we deem it unneces-sary to consider others.  Accordingly, we base our opinion solely on the grounds stated and do not pass on any con-stitutional issues other than those expressly considered herein.

### SUMMARY

House Bill 174 is unconstitutional by reason of (1) authorizing the levying of an occupation tax without setting apart annually one-fourth ($\frac{1}{4}$) of the revenue derived

from such tax for the benefit of
the public free schools of Texas
in violation of Section 3 of Article
VII of the Texas Constitution and
(2) authorizing the levying of an
occupation tax on persons engaged in
agricultural pursuits, in violation
of Section 1 of Article VII of the
Texas Constitution.

Very truly yours,

WILL WILSON
Attorney General of Texas

By *Henry G. Braswell*

Henry G. Braswell
Assistant

HGB:mg

APPROVED:

OPINION COMMITTEE
Geo. P. Blackburn, Chairman

Riley Eugene Fletcher
Charles D. Cabaniss
William R. Hemphill
Tom I. McFarling

REVIEWED FOR THE ATTORNEY GENERAL
By:  W. V. Geppert